IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| MEANITH HUON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.:   1: 11-cv-3054 |
| | ) |
| | ) JURY TRIAL DEMANDED |
| | ) |
| BREAKING MEDIA, LLC a/k/a | ) |
| BREAKING MEDIA; | ) |
| BREAKING MEDIA, INC. a/k/a | ) |
| BREAKING MEDIA; | ) |
| DAVID LAT; ELIE MYSTAL; | ) |
| JOHN LERNER; DAVID MINKIN; | ) |
| | ) |
| GAWKER MEDIA, LLC a/k/a | ) |
| GAWKER MEDIA; | ) |
| BLOGWIRE HUNGARY SZELLEMI | ) |
| ALKOTAST HASZNOSITO KFT | ) |
| GAWKER MEDIA GROUP, INC. a/k/a | ) |
| GAWKER MEDIA; | ) |
| GAWKER ENTERTAINMENT, LLC | ) |
| GAWKER TECHNOLOGY, LLC | ) |
| GAWKER SALES, LLC, | ) |
| NICK DENTON; IRIN CARMON; | ) |
| GABY DARBYSHIRE. | ) |
| | ) |
| Defendants. | ) |

**THIRD AMENDED COMPLAINT**

Plaintiff, Meanith Huon, complains of the Defendants as follows:

**CAUSE OF ACTION**

1.      This a diversity action brought pursuant to 28 U.S.C. Section 1332 for defamation

(both per se and per quod), invasion of privacy (both false light and unreasonable intrusion upon

seclusion of another), intentional infliction of emotional distress, civil conspiracy (to defame

Plaintiff and to invade his privacy), cyberstalking and cyberbullying.

1

2.      This action arises out of Defendants' dissemination of knowingly false statements about Plaintiff, Meanith Huon, in a variety of national and international social media as well as on the Internet. To wit, Defendants falsely depicted Mr. Huon as, among other things, a rapist, a serial rapist, a lawyer who posed as a supervisor and a talent scout to meet women, as someone who got away with rape, as a sexual deviant.   Defendants statements" were intended to, and were in fact, read by many in the United States and people worldwide, including potential business employers and clients and family and friends of Mr. Huon.

3.      Defendants' statements about Mr. Huon are untrue and were made with knowledge of falsity or with reckless disregard to the truth of such statements. Defendants wrote and published, and intended for republication, the statements with malice and a conscious disregard for the truth for the purpose of furthering Defendants' own agenda of generating ad revenue, generating website traffic and comments among its website users, publishing web content, preserving Defendants" influence in social media, and/or securing material business and economic advantage.

4.      The false, malicious and defamatory statements that Defendants published on the Internet websites evidence a highly offensive and outrageous prying by Defendants into Plaintiff's private life and affairs.  By its conduct, Defendants engaged in cyberbullying and/or cyberstalking of Mr. Huon.

5.      Defendants' broad dissemination of defamatory statements about Mr. Huon has caused severe economic, competitive and reputational harm to Mr. Huon. The success of Mr. Huon derives from his professional reputation as an attorney and standing in the community. Plaintiff has experienced lost business or employment opportunities. Additionally, Mr. Huon

2

personally has suffered humiliation and embarrassment as a result of the dissemination of the false statements by Defendants.

6.      Plaintiff seeks compensatory and punitive damages against Defendants for their actions, as well as injunctive relief, enjoining Defendants (either directly or through any third party) from further publishing or re-publishing the Actionable and Offensive Statements either on websites or elsewhere, from further publishing or re-publishing any detail from Plaintiff's private life or affairs and from unreasonably intruding upon Plaintiff's right of privacy.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Section 1332, in that complete diversity exists between Plaintiff and the Defendants and the matter in controversy exceeds the sum of $75,000.00 dollars, exclusive of interest and costs.

8.      Venue is proper pursuant to 28 U.S.C. §1391 (b), because a substantial part of the events or omissions giving rise to the claim occurred within the district.   Furthermore, Defendants directed their conduct toward Plaintiff in this district.  Additionally, the state in which the victim of the defendant's defamation lived has jurisdiction over the victim's defamation suit. Calder v. Jones, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984); Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410, 412 (7th Cir. Ind. 1994).

## THE PARTIES

9.      At all relevant times, Plaintiff, Meanith Huon, was and is a citizen of the State of Illinois.  Citizenship for purposes of the diversity jurisdiction is domicile, and domicile is the

place one intends to remain.  Dakuras v. Edwards, 312 F.3d 256, 258 (7th Cir. Ill. 2002).  Mr.

Huon has lived and practiced in Illinois since May of 1996 and intends to remain in Illinois.

10.     At all relevant times, Defendant, Breaking Media, LLC a/k/a Breaking Media, is a

limited liability company organized and operating under the laws of the State of New York with

its principal place of business in New York.  Thus, Breaking Media, LLC a/k/a Breaking Media

is a citizen of New York and Delaware, pursuant to 28 U.S.C. 1332(c).

11.     At all relevant times, Defendant, Breaking Media, Inc. a/k/a Breaking Media, is a

Delaware corporation organized and operating under the laws of the State of New York with its

principal place of business in New York.  Thus, Breaking Media, Inc. a/k/a Breaking Media is a

citizen of New York and Delaware, pursuant to 28 U.S.C. 1332(c).  Defendant, Breaking Media,

Inc. d/b/a Breaking Media is a continuation of or merger of Breaking Media, LLC d/b/a Breaking

Media. Frank IX & Sons, Inc. v. Phillipp Textiles, Inc., 1998 U.S. App. LEXIS 24553 (7th Cir.

Ill. Sept. 28, 1998).

12.     At all relevant times, Defendant, Breaking Media, LLC a/k/a Breaking Media, and

Defendant, Breaking Media, Inc. a/k/a Breaking Media owns, operates, controls, and/or publishes

several websites, including Abovethelaw.com and BreakingMedia.com which disseminate

information worldwide via the Internet.

13.     At all relevant times, Defendant, David Lat, was and is a citizen of the State of

New York.  Defendant Lat was and is the managing editor of Abovethelaw.com.  Defendant Lat

is the founding editor of Above the Law.  Prior to Above the Law, Lat worked as a litigation

associate at Wachtell, Lipton, Rosen & Katz, in New York.  He lives in NY, NY.

4

http://abovethelaw.com/author/david-lat/; http://twitter.com/DavidLat;

http://www.facebook.com/davidlat.

14.     At all relevant times, Defendant, Elie Mystal, was and is a citizen of the State of New York. Defendant Mystal was and is a writer and editor for Abovethelaw.com. Defendant Mystal lives in NY, NY and has written editorials for the New York Daily News and the New York Times. http://abovethelaw.com/author/elie-mystal/; http://www.facebook.com/mystal.

15.     At all relevant times, Defendant John Lerner was and is a citizen of the State of New York. Defendant Lerner was and is the Chief Executive Officer of Breaking Media. http://breakingmedia.com/contact-us/ ; http://www.linkedin.com/in/jlerner?trk=pub-pbmap.

16.     At all relevant times, Defendant, David Minkin was and is a citizen of the State of New York. Defendant Minkin was and is the publisher of Abovethelaw.com and Breakingmedia.com. Defendant Minkin can be reached at 212.334.1871 x1 (New York area code). http://breakingmedia.com/contact-us/; http://www.linkedin.com/in/davidminkin.

17.     Defendants, Breaking Media, LLC a/k/a Breaking Media, Breaking Media, Inc. a/k/a Breaking Media, Lat, Mystal, Lerner, and Minkin shall sometimes hereinafter be referred to as the "Abovethelaw Defendants."

18.     At all relevant times, Defendant, Gawker Media LLC a/k/a Gawker Media, was and is a limited liability company organized and operating under the laws of the State of Delaware with its principal place of business in New York.

19.     At all relevant times, Defendant, BLOGWIRE HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT was and is a Hungarian offshore company. Thus, Defendant,

5

BLOGWIRE HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT a/k/a Gawker Media is a citizen of Hungary, pursuant to 28 U.S.C. 1332(c).  Defendant, BLOGWIRE HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT, owns the domains Gawker.com and Jezebel.com.

20.     At all relevant times, Defendant, Gawker Media Group Inc. a/k/a Gawker Media, was and is a Cayman Islands corporation.  Thus, Defendant, Gawker Media Group Inc. a/k/a Gawker Media,  is a citizen of the Cayman Islands, pursuant to 28 U.S.C. 1332(c).

21.     At all relevant times, Defendant, Gawker Entertainment, LLC, was and is a New York limited liability company.  Thus, Defendant, Gawker Entertainment, LLC, was and is a citizen of New York, pursuant to 28 U.S.C. 1332(c).

22.     At all relevant times, Defendant, Gawker Technology, LLC, was and is a New York limited liability company.  Thus, Defendant, Gawker Technology, LLC,  was and is a citizen of New York, pursuant to 28 U.S.C. 1332(c).

23.     At all relevant times, Defendant, Gawker Sales LLC was and is a New York limited liability company.  Thus, Defendant, Gawker Sales LLC,  was and is a citizen of New York, pursuant to 28 U.S.C. 1332(c).

24.     Defendants, Gawker Media LLC, Gawker Entertainment LLC, Gawker Technology LLC, Gawker Sales LLC, are under the control of a shell company based in the Cayman Islands, Defendant, Gawker Media Group Inc.  http://blogs.reuters.com/felix-salmon/2010/12/01/the-new-gawker-media/;

http://www.newyorker.com/online/blogs/johncassidy/2010/12/gawker-stalker-nick-denton-spotted-in-cayman-islands.html.

25.     Defendants, Gawker Media LLC a/k/a Gawker Media, BLOGWIRE HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT, Gawker Media Group Inc. a/k/a Gawker, Gawker Entertainment LLC, Gawker Technology LLC, Gawker Sales LLC owns, operates, controls, and/or publishes several websites, including Gawker.com and Jezebel.com, which disseminate information worldwide via the Internet.

26.     At all relevant times, Defendant, Gawker Media LLC a/k/a Gawker Media owned, operated, controlled, and/or published Fleshbot.com, a pornographic website.

27.     At all relevant times, Defendant Nick Denton was and is, a citizen  of Hungary and the United Kingdom.  He resides at 76 Crosby Street, Apt 2B, New York, NY 10012-3957 and/or 81 Spring Street, Apt. 2B, New York, NY 10012-3904.  Defendant Denton was the founder of Gawker Media and currently owns Gawker Media.

http://www.facebook.com/nicknotned

28.     At all relevant times, Defendant, Irin Carmon was and is a citizen of the State of New York.  Defendant Carmon is a reporter for Jezabel.com.  http://twitter.com/irincarmon; http://irincarmon.com/

29.     At all relevant times, Defendant, Gabby Darbyshire was and a citizen of the State of New York.  Defendant Darbyshire was, and currently is, the Chief Operating Officer of Gawker Media. http://twitter.com/gabyd; http://www.linkedin.com/pub/gabrielle-

darbyshire/0/3/56; http://www.npr.org/2011/01/03/132613645/Gawker-Wants-To-Offer-More-Than-Snark-Vicious-Gossip

30.     Defendants, Gawker Media LLC a/k/a Gawker Media, BLOGWIRE HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT, Gawker Media Group Inc. a/k/a Gawker Media, Gawker Entertainment, LLC, Gawker Technology, LLC, Defendant, Gawker Sales LLC,  shall sometimes hereinafter be referred to as the "Jezebel Defendants."

31.     The Jezebel Defendants are in the business of hosting websites designed to defame targeted victims with obscene, false and fraudulent headlines and articles for the purpose of generating web traffic which translates into advertising revenue.  In that regard, the Jezebel Defendants, and each them, by and through their websites, disseminate pornography, salacious headlines, articles and photographs concerning their targeted victims, thereby inflaming the public and, thereafter, encouraging their readers to defame, malign, disparage and harass the targeted victims by posting their own extreme, outrageous, and defamatory comments on these websites.

## FACTS

32.     Plaintiff , Meanith Huon, is an attorney   licensed to practice law in the State of Illinois since May 9, 1996.  He is admitted to practice before the Northern District of Illinois, the Central District of Illinois, the Southern District of Illinois,  (including the Federal Trial Bar for the Northern District of Illinois), and the Seventh Circuit.  Mr. Huon has never been convicted of a felony or misdemeanor.

33.     On or about July 2, 2008, Plaintiff was falsely accused by "Jane Doe" and

charged with criminal sexual assault.  The investigating detectives never interviewed two key witnesses at the scene of the alleged occurrence.   According to the police report, the investigating detective told Mr. Huon that "that at no time was he being accused of striking [Jane Doe] nor physically threatening her with violence."  The investigating detective  stated in his report that he told Mr. Huon that Jane Doe "had been very intimidated by Huon reportedly yelling at her" and that "a small amount of physical contact" was alleged by Jane Doe.  The investigating detectives asked Jane Doe to contact Mr. Huon by telephone to arrange for a private meeting between Jane Doe and Mr. Huon.

34.    Shortly after his arrest in 2008, Jane Doe visited Mr. Huon's then defense attorney, William Lucco, but was turned away.   In 2009, Jane Doe Googled "Meanith Huon" and stalked him online, in an attempt to communicate with him.  Jane Doe found a blog that contained postings on God and musings on life, including the posting "10 reasons why I'd make a good husband for you 'dede'."   The blog not state anything threatening or intimidating and did not refer to Jane Doe by her legal name.  Jane Doe advised Madison County prosecutors that she Googled Mr. Huon and found the aforesaid blog.  Unable to pressure Mr. Huon into accepting a guilty plea of 12 years in the 2008 case, the Madison County State's Attorney's Office retaliated by falsely arresting Mr. Huon and prosecuting him for cyberstalking and witness harassment  in 2009.

35.    In May of 2010, a trial was held in Madison County, Illinois and, after only two hours of deliberation, Plaintiff , Meanith Huon, was acquitted of the sexual assault charges.

36.    After Mr. Huon was acquitted in May of 2010, the cyberstalking and witness harassment  charges in the 2009 case were not dismissed until almost seven months later on or

about December 6, 2011.  On or about the same day, the Madison County State's Attorney whose office had prosecuted the case was sworn into office as an elected judge.

37.     Defendants are not reporters or journalists whose conduct is governed by a code of ethics in news gathering and reporting, such as the Society of Professional Journalist Code of Ethics.   http://www.spj.org/ethicscode.asp.  News organizations like the New York Times and Business Week have a code of ethics.

38.     Defendants are website operators and bloggers who created websites to generate advertising dollars from the traffic, including sponsored or moderated comments and discussions. Defendants generates web traffic and advertising dollars by defaming individuals like Mr. Huon and profiting from other people's miseries.

39.     Defendants did not make a report of an official proceeding but posted comments from other web sources on the Internet. Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d 558, 588 (Ill. 2006).

40.     Defendants did not make a report that was a complete and accurate or a fair abridgement of the official proceeding. Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d 558, 588 (Ill. 2006).

## I. ABOVETHELAW.COM

41.     On or about May 6, 2010, on the day that Plaintiff, Meanith Huon, was acquitted of all sexual assault charges, the Abovethelaw Defendants, disseminated, published, and re-published numerous Actionable and Offensive Statements via a post on Abovethelaw.com which are false, misleading and defamatory statements of fact.

10

42.     The Abovethelaw Defendants posted a story on a former New York Giants linebacker who was charged with third-degree rape involving a 15 year-old girl .  The Abovethelaw Defendants followed this story with the prefatory comment that the next story regarding Mr. Huon is "from the files of the wanton and depraved".  What can be more wanton and depraved than raping a 15 year-old girl?

43.     On the day that Plaintiff, Meanith Huon, was acquitted of all sexual assault charges, the Abovethelaw Defendants posted  "breaking rape coverage".  The Abovethelaw.com Post is set forth herein below and a copy is attached as Exhibit "A":

## Rape Potpourri

We've got a couple of rape stories…

"Here at ATL, we're your one-stop shop for breaking rape coverage.  We cover the rape allegations of the rich and famous, as well as any alleged attorney rapists near you…

Our next story from the files of the wanton and depraved is a little more in our wheelhouse. A St. Louis-area lawyer came up with an excellent little game to meet women. Meanith Huon allegedly listed Craigslist ads where he claimed to be a talent scout for models.

So far, so good.  I once pretended to be an Ostrich rancher from sub-Saharan Africa because I was trying to impress bubble gum princesses at a BU party.  But Huon's potentially harmless lies allegedly turn dastardly, pretty quickly:

The victim said she responded to a Craigslist ad posted by Huon in late June, seeking promotional models, sending her resume, her phone number and two pictures of herself…

The two agreed to meet at the downtown St Louis bar Paddy O's, the

11

victim testified.

But the next day, the victim was running late and called Huon. He told her to meet him at another bar, but when she got there, he told her the other promotional models left, and so he was going to interview her, the victim said.

And this people, is why God invented Google. Had the victim Googled Huon, she would have found stories like this, from the Madison County Record:

A Chicago attorney who was posing as a supervisor for a company that sets up promotions for alcohol sales at area bars was charged in Madison County July 2, with two counts of criminal sexual assault, two counts of criminal sexual abuse and one count of unlawful restraint.

Meanith Huon, 38, of 3038 S Canal St. in Chicago, was arrested by the Chicago Police Department on July 1, and was transferred to Madison County the next day.

Or she might have come across this link, at Lawyer Gossip:

Lawyer, Meanith Huon, 39, who was originally charged with criminal sexual assault, sexual abuse and unlawful restraint is now facing charges of harassment and cyber stalking!

Of course, women shouldn't have to assume that every guy they meet is a potential rapist. But apparently there are a lot of depraved dudes walking around out there that are potential rapists.

In any event:

Huon and the woman went to a couple of bars near Busch Stadium, then to a Laclede's Landing bar before Huon asked the victim if she wanted to go to Pop's in Sauget to meet the other models.

The woman agreed, but told Huon she didn't have enough gas in her car, so she went with him, she said.

12

This is gonna end badly.

As Huon's Honda Civic crossed the Poplar Street Bridge, the victim said Huon drove past the Sauget exit and continued north on Interstate 55. As the car was moving, Huon fondled the woman, then forced her to perform oral sex on him, the victim said.

Oh, come on. If somebody was driving and tried to "force" me to perform oral sex on them. I'd just get out of the stupid car. Which is to say, I'd do *exactly* what the victim did in this case.

Huon exited Interstate 55 near New Douglas, looking, the victim said, for a secluded place to make out with her. The victim leaped from the moving car, she said, to escape Huon, leaving her cell phone, purse, shoes and identification in his car.

"If he wasn't going to take me back to the freeway, I had made a decision to do anything I could to get out of that car," the victim testified.

Assistant State's Attorney Chris Hoell showed pictures to the jury of the woman's bruised knees, skinned feet and cut toes.

Damn. If you can't get a woman to consensually stay in a moving vehicle, can you really get her to consensually agree to sex (insofar as lying to her about your job and your intentions to get her into the car counts as consensual in the first place)?

Obviously, Huon sees things differently.

Mike Mettes, Huon's defense lawyer, said during his opening statement that Huon and the victim met, but at some point in the evening, it became social and the two of them had consensual sex. But the victim asked for $500 and threatened if Huon didn't pay her, she would "cry rape," the attorney argued.

So we're not denying that she hurled herself out of a moving vehicle, we're

contending that she jumped out of the car to make it look like she was raped? Right, sure. That sounds like the definition of incredible.

It seems to me that there is entirely too much (alleged) raping going on in this country. If this keeps up, men and women are going to have to start carrying around sexual consent forms on their persons.

I, the undersigned, being of sound mind and hot body, do hereby consent to affixing my _____to the other party's_____.  Such amorous undulations include, but are not limited to,_____ , _____, and _____, all proposals will be considered so long as no animals (barnyard or otherwise) are involved.

I claim no rights to future _____ , _____, or _____ , in exchange for this brief interruption in my chronic loneliness.

While I may be quite intoxicated right now, I know damn well what I'm doing.


44.     Defendants, Breaking Media, LLC a/k/a Breaking Media, Breaking Media, Inc. a/k/a Breaking Media, Lat, Mystal, Lerner, and Minkin published and disseminated the defamatory articles and comments worldwide via the Internet.

45.     The post was written by Defendant Mystal. Defendants continued to republish and disseminate the above-mentioned defamatory statements worldwide after May 6, 2010.45.

46.     There were more than 107 comments by Defendants' users.

47.     The actionable and offensive statements set forth in the Abovethelaw.com post include:

a.      Stating and/or inferring that Plaintiff is an attorney rapist;

b.      Stating and/or inferring that Plaintiff is wanton and depraved;

c.      Stating and/or inferring that Plaintiff had an excellent game to meet women;

d.      Stating that Plaintiff allegedly listed Craigslist ads where he claimed to be a talent scout for models thereby inferring that Plaintiff is a sexual predator;

e.      Stating and/or inferring that Plaintiff told lies and is a liar;

f.      Stating and/or inferring that Plaintiff is dastardly;

g.      Stating that the complainant is a "victim" of Plaintiff thereby inferring that the complainant was actually criminally assaulted by Plaintiff;

h.      Stating that the complainant responded to a Craigslist ad posted by Plaintiff in late June seeking promotional models thereby inferring that Plaintiff is some kind of sexual predator;

i.      Stating that if the complainant had Googled Plaintiff's name, she would have found other stories in the Madison County Record and other sites inferring that Plaintiff had a criminal record, that there was more than one woman victim or was otherwise dangerous;

j.      Stating that Plaintiff was posing as a supervisor for a company that sets up promotions for alcohol sales at area bars;

k.      Stating and/or inferring that Plaintiff is a potential rapist and/or "depraved dude" walking around who is a potential rapist;

l.      Stating and/or inferring that Plaintiff fondled the complainant and forced her to perform oral sex on him;

m.      Stating that a photograph of the complainant showed bruised knees, skinned feet and cut toes, thereby inferring that Plaintiff caused physical harm to the complainant;

n.      Stating and/or inferring that Plaintiff lied to the complainant about a job and his intentions in order to lure her into a car;

o.      Stating that the complainant hurled herself out of a moving vehicle thereby

15

inferring that she was assaulted and/or in danger of being assaulted by Plaintiff;

        p.      Stating and/or inferring that Plaintiff has committed rape;

        q.      Stating and/or inferring that Plaintiff is chronically lonely, was desirous of a hot body, sought amorous undulations and has or would have sexual relations with a barnyard animal;

        r.      Stating and/or inferring that Plaintiff requires a consent form in order to have sex;

        s.      Stating and/or inferring that Plaintiff had raped the complainant in "breaking rape coverage" on the date that he was acquitted of sexual assault charges;

        t.      Stating and/or inferring that the complainant is a minor or bubble-gum princess;

        u.      Stating and/or inferring that Plaintiff's acts or conduct was more depraved and wanton than  raping a 15 year-old girl;

        v.      Stating and/or inferring that Plaintiff was a sex offender or sexual predator;

        w.      Stating and/or inferring that Plaintiff was pedophile;

        x.      Stating and/or inferring that Plaintiff used the Internet to meet women for sex.

        y.      Stating and/or inferring that Plaintiff told complainant that  "other promotional models left" and that Plaintiff " was going to interview her" thereby inferring that Plaintiff  lured complainant under the guise of a job interview.

        z.      Stating and/or inferring that "This is gonna end badly" thereby inferring that the allegations of rape are credible.

        aa.      Stating and/or inferring that "Oh, come on.   If somebody was driving and tried to "force" me to perform oral sex on them, I'd just get out of the stupid car.   Which is to

say, I'd do exactly what the victim did in this case", thereby improving the credibility of the defamation.

bb.     Stating and/or inferring that the jury was allowed to consider the defense of rape in their deliberations: ""Damn. If you can't get a woman to consensually stay in a moving vehicle, can you really get her to consensually agree to sex (insofar as lying to her about your job and your intentions to get her into the car counts as consensual in the first place)? Obviously, Huon sees things differently."

cc.     Stating and/or inferring that "It seems to me that there is entirely too much (alleged) raping going on in this country", thereby inferring that Plaintiff got away with rape and improving the credibility of the rape charges on the date of Mr. Huon's acquittal.

48.     Defendants knew or should have known that certain statements in the article were false at the time they were made and published.

49.     Defendants did not make a report of the official proceedings but relied on sources on the Internet.  Myers v. The Telegraph, 332 Ill.App.3d 917, 922 (5th Dist. 2002).

50.     Defendants never reviewed the transcript of the official proceedings before making the post.

51.     Defendants have admitted in pleadings filed with the Court that the defamatory posting contained no hyperlink to a news article.

52.     Some of the aforesaid defamatory matter do not appear in the official record or proceedings.

53.     Some of the aforesaid statements charged Mr. Huon with unfair business practices, impugning his integrity, prejudicing his practice of law, and/or implying that he

committed a crime and falls within several of the recognized categories of defamation *per se.*
Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d 558, 590 (Ill. 2006).

54.      Defendant posting was not a fair abridgment of the official proceedings and did

not convey to readers "a substantially correct account."  Restatement (Second) of Torts § 611,

Comment f, at 300 (1977).

55.      Defendants' posting  expanded on the official report by the addition of fabricated

evidence designed to improve the credibility of the defamation.  Snitowsky v. NBC Subsidiary

(WMAQ-TV), Inc., 297 Ill.App.3d 314, 310 (1st Dist. 1988).

56.      Defendants intentionally omitted, among other things, the following facts:

a.      The complainant that is the subject of all the news articles is the same woman.

b.      The jury was not allowed to consider the consent defense, because Mr. Huon did

not testify and the trial judge barred the consent defense before closing arguments.  Thus, the

jury had to have found that no sexual contact took place.

c.      The complainant sustained minor injuries from walking or running in a cornfield.

d.      There was no evidence of a Craigslist ad for a job for promotional modeling.

e.      There was no evidence that Mr. Huon represented himself as a talent scout.

f.      The video evidence at trial showed Mr. Huon, dressed in shorts, on a Sunday

afternoon with the complainant, in a bar.

f.      There was no DNA evidence of semen and the complainant never went to the

hospital.

g.      The detectives never interviewed the two key witnesses at the scene who testified

at trial that the complainant gave different versions of the alleged incident.

h.     The detectives asked the complainant to call Mr. Huon to arrange a private meeting and to ask for money.

i.     The complainant had gone drinking with Mr. Huon at several bars for hours.

j.     There was no physical evidence presented that the complainant jumped out of a moving car.

k.     There was no evidence of force presented at trial.   The police report stated that complainant alleged that Mr. Huon raised his voice but that Mr. Huon never threatened the complainant.

l.     The photograph of the complainant showed no injuries (besides from her walking in a cornfield barefoot) and   showed her clothes to be completely intact with no tears.

m .     Mr. Huon was not a St. Louis-area lawyer .   He was a financial advisor for St. Louis-based Edward Jones Investments at the time of the alleged incident

n.     The complainant was 26 years old at the time of the alleged incident and not a minor or a bubble gum princess.

o.     The complainant's boyfriend was arrested in 2008 and  convicted and sentenced in 2009  for possession and intent to distribute cannabis in Federal Court in St. Louis, Missouri.

p.     Mr. Huon was not charged with "rape" to the extent that he was not charged with forcing the complainant to have vaginal sexual intercourse by penile penetration.

q.     The complainant made conflicting statements to two key witnesses—who were never interviewed by the detectives.

r.     Defendants omitted that Mr. Huon had been acquitted on May 6, 2010.

57.     Defendants defamed Mr. Huon and placed him in a false light by inaccurately reporting his defense attorney's opening argument.   Defendants omitted that Mr. Huon's defense counsel was relying on information contained in the police report that was replete with false statements and that opening argument is not a statement of the facts.

58.     Defendants created the following consent form which further defamed Mr. Huon and placed him in a false light :

> I, the undersigned, being of sound mind and hot body, do hereby consent to affixing my _____to the other party's_____.  Such amorous undulations include, but are not limited to,_____ , _____, and _____, all proposals will be considered so long as no animals (barnyard or otherwise) are involved.
>
> I claim no rights to future _____ , _____, or _____ , in exchange for this brief interruption in my chronic loneliness.
>
> While I may be quite intoxicated right now, I know damn well what I'm doing.

59.     The consent form defames Mr. Huon and places him in a false light in that it suggests that he has "chronic   loneliness", was seeking a "brief interruption" for a "hot body" from anyone other than a "barnyard" animal.

60.     The consent form defames Mr. Huon and places him in a false light   in that he is intimated as a rapist who needs to use a consent form.

61.     The consent form defames Mr. Huon and places him in a false light in that the trial judge barred the consent defense and Mr. Huon's defense attorneys were barred from arguing consent.   Consent was not a defense submitted to the jury for their deliberation.

62.    Defendants conducted no investigation into the reliability or accuracy of the sources of the news articles or allegations on the internet.   Defendants never contacted Mr. Huon before publishing the defamatory post.

63.    Defendants relied on a posting by a blog called Lawyergossip.com. Defendants omitted that when Mr. Huon had asked Lawyergossip.com to remove the false and defamatory statements, Lawyergossip.com contacted the Madison County States Attorney's Office, who called Mr. Huon's defense attorney and threatened to bring more criminal charges against Mr. Huon.

64.    Defendants omitted that when Mr. Huon asked the newspapers to remove the false and defamatory statements, a reporter contacted   Mr. Huon's defense attorneys to complain during trial, adversely affecting Mr. Huon's relationship with his defense attorney .

65.    The Abovethelaw Defendants have a history of cyberstalking or cyberbullying Mr. Huon.  On or about July 3, 2008, Defendants  called Mr. Huon "Lawyer of the Day" and linked the post to a defamatory article from the Madison County Record that contained false statements and defamed Mr. Huon.   Defendants' post and links continued to be republished on the Abovethelaw.com website and were made available worldwide on May 6, 2011.   The post continued to be made available online to the world, including Illinois readers, after May 6, 2011. A true and correct copy of this posting by Above The Law.com is attached hereto as Exhibit "B."

66.    The Abovethelaw Defendants intentionally invented facts in the postings by identifying the same complainant that is the subject of several news articles or postings as multiple and different victims.   The writer and editor, both Harvard-educated attorneys, have the competency to read news articles or postings  that are written at the 6th grade level.

21

67.     The Abovethelaw Defendants knew or should have known that the same complainant was the subject of the various news articles and postings, because    Defendants called Mr. Huon in the July 3, 2008 posting " Lawyer of the Day" and attached a link to an article regarding the complainant.

68.     The Abovethelaw Defendants knew or should have known that the allegations about Mr. Huon were false when Defendants' own posting  falsely stated that Mr. Huon posed as a talent scout and as a supervisor for a promotions company.   Clearly, Mr. Huon cannot pose as two different people to the same woman.

69.     The Abovethelaw Defendants falsely stated or intimated that there were other women victims that Mr. Huon allegedly had raped but did not explain that the same woman is the subject of all news stories or blog posts and that Mr. Huon was acquitted of sexual assault.

70.     The Abovethelaw Defendants moderate and control its users' comments.  The Defendants have a written policy on the content of the users' comments and can moderate, control, delete, and/or promote comments and discussions:

**Monitoring and Enforcement; Termination**

We have the right to:

■Remove or refuse to post any User Contributions for any reason in our sole discretion.

■Take any action with respect to any User Contribution that we deem necessary or appropriate in our sole discretion if we believe that such User Contribution violates the Terms of Use, including the Content Standards, infringes any intellectual property right, threatens the personal safety of users of the Website and the public or could create liability for the Company.

■Disclose your identity to any third party who claims that material posted by you violates their rights, including their intellectual property rights or their right to privacy.

■Take appropriate legal action, including without limitation, referral to law enforcement, for any illegal or unauthorized use of the Website.

■Terminate your access to all or part of the Website for any or no reason, including without limitation, any violation of these Terms of Use.


\*                                    \*                                    \*

### Content Standards

These content standards apply to any and all User Contributions and Interactive Services. User Contributions must in their entirety comply with all applicable federal, state, local and international laws and regulations. Without limiting the foregoing, User Contributions must not:

■Contain any material which is defamatory, obscene, indecent, abusive, offensive, harassing, violent, hateful, inflammatory or otherwise objectionable.

■Promote sexually explicit or pornographic material, violence, or discrimination based on race, sex, religion, nationality, disability, sexual orientation or age.

■Infringe any patent, trademark, trade secret, copyright or other intellectual property rights of any other person.

■Violate the legal rights (including the rights of publicity and privacy) of others or contain any material that could give rise to any civil or criminal liability under applicable laws or regulations or that otherwise may be in conflict with these Terms of Use and our Privacy Policy www.abovethelaw.com/privacy-policy/

■Be likely to deceive any person.

■Promote any illegal activity, or advocate, promote or assist any unlawful act.

■Cause annoyance, inconvenience or needless anxiety or be likely to upset, embarrass, alarm or annoy any other person.

■Be used to impersonate any person, or to misrepresent your identity or affiliation with any person or organization.

■Involve commercial activities and/or sales without our prior written consent, such as contests, sweepstakes and other sales promotions, barter, advertising or pyramid schemes.

■Give the impression that they emanate from us, if this is not the case.

http://abovethelaw.com/terms-of-service/.

71.    The Abovethelaw Defendants' user identified as "LatherRinseRepeat", posted the false and defamatory statement that "Huon has a history . . . Looks like he's in for another ass kicking" on the Abovethelaw.com website on or after May 6, 2011.   A copy of this posting is attached as Exhibit "C".   The aforesaid statement continued to be posted on the Abovethelaw.com website and made available worldwide after May 6, 2011.

72.    Defendants knew or should have known that the aforesaid statements were false at the time they were made and published.  Defendants did not promptly remove this comment even though the defamatory and false statement violated the Abovethelaw.com's own written content standards prohibiting "any material which is defamatory, obscene, indecent, abusive, offensive, harassing, violent, hateful, inflammatory or otherwise objectionable."

## II.   JEZEBEL.COM

73.    More than one year after Plaintiff , Meanith Huon, was acquitted of sexual assault charges, on or about May 11, 2011, the Jezebel Defendants posted an article on the Jezebel.com website entitled "**Acquitted Rapist Sues Blogger For Calling Him Serial Rapist**" with an image of Mr. Huon's mugshot.  The post was written by Defendant Carmon.  The said post was

disseminated, published and republished worldwide on the Internet.   The Jezebel.com post is set forth herein below as follows:

## Acquitted Rapist Sues Blogger For Calling Him Serial Rapist  [Mugshot of Meanith Huon]

A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying that he's a serial rapist. If Meanith Huon gets his way, blogger sloppiness may cost ATL $50 million.

Huon, a lawyer, was initially charged with two counts of sexual assault, two counts of sexual abuse, and one count of unlawful restraint. A woman had jumped out of his car, ran through a cornfield barefoot, and knocked on a random person's door saying he had forced her into sexual activity. She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. Huon's version was that it was a consensual encounter, and partly on the strength of a bartender's testimony that the woman had been drinking and asked where to go to have fun, the jury believed him.

Huon is also suing local law enforcement authorities in Madison County, Illinois for prosecutorial misconduct. His beef with Above The Law stems from a roundup post entitled "Rape Potpurri," in which blogger Elie Mystal mistakenly believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was a serial offender. "The content of the article were [sic] defamatory in that it incorrectly and recklessly portrayed Mr. Huon as a serial rapist by treating the same complaining witness as three different women," says the complaint, according to Forbes.

"And this, people, is why God invented Google," wrote Mystal in the original post, linking to articles that in fact described the same case. The lesson learned: Google only takes you so far.

A true and correct copy of the Jezebel.com Post is attached hereto as Group Exhibit "D."

74.     A link to the Abovethelaw.com article was and is placed below the defamatory article:

Related: Rape Potpurri [ATL].  Group Exhibit "D."

75.     The Jezebel Defendants continue to publish and disseminate the aforesaid article. Below the article in Discussions Section is the original headline:

"Acquitted Rapist Sues Blog For Calling Him Serial Rapist".  Group Exhibit "D."


There were more than 4,374 views of the article.


76.     The Gawker Media Defendants disseminated, published, and republished the same defamatory article from Abovethelaw.com notwithstanding the fact that Abovethelaw.com had removed the defamatory article from its website.

77.     The rule that each republication of a libel constitutes a separate cause of action which starts the statute of limitations running anew is firmly established in Illinois.  MIDWEST BANK BUILDERS v. DUN & BRADSTREET, INC., 1978 U.S. Dist. LEXIS 17937 (N.D. Ill. May 4, 1978).  Republication can constitute a new cause of action if the publication is altered so as to reach a new audience or promote a different product. Lyssenko v. Int'l Titanium Powder, LLC, 2010 U.S. Dist. LEXIS 29771 (N.D. Ill. Mar. 25, 2010); When a defamatory statement is published to a third person, that person in turn may be liable for republication of the communication to yet another individual.  Solaia Tech., LLC v. Specialty Publ. Co., 221 Ill. 2d 558, 598 (Ill. 2006)

78.     Defendant republishes a defamatory statement when  defendant edits and retransmits the defamatory material, or distributes the defamatory material for a second time with

the goal of reaching a new audience online.   Where substantive material is added to a website, and that material is related to defamatory material that is already posted, a republication has occurred.  <u>Davis v. Mitan (In re Davis)</u>, 347 B.R. 607, 611-612 (W.D. Ky. 2006); <u>Woodhull v. Meinel</u>, 145 N.M. 533 (N.M. Ct. App. 2008).

79.     The Jezebel.com post is replete with actionable and offensive statements which are false, misleading and defamatory statements of fact, including the following:

a.      Stating and/or inferring that Plaintiff is an "Acquitted Rapist";

b.      Stating and/or inferring that Plaintiff is a rapist;

c.      Stating and/or inferring that Plaintiff is a serial rapist;

d.      Stating and /or inferring that Plaintiff had raped more than one woman.

e.      Stating and /or inferring that the lesson is that Google only takes you so far, thereby, inferring that Mr. Huon has a criminal background that does not show up in a Google search;

f.      Stating and/or inferring that Plaintiff has committed a crime by posting his mugshot more than one year after he was acquitted;

g.      Stating  and/or inferring that Plaintiff is a sexual predator or sex offender;

h.      Stating  and/or inferring that Plaintiff was acquitted "partly on the <span style="color:red">strength</span> of a bartender's testimony that the woman had been drinking and asked where to go to have fun".

80.     In addition to the actionable and offensive statements made by the Jezebel Defendants, the Jezebel Defendants engaged in other intentional acts of wrongdoing in an effort to intimidate, harass and destroy Plaintiff's reputation and to invade Plaintiff's privacy including, but  not limited to:

27

a.   Encouraging, aiding and abetting users of the Jezebel.com website to post salacious and defamatory statements about Plaintiff; and

b.   Posting Plaintiff's booking photo on its website and encouraging readers to Google Plaintiff's telephone number and address so that they may contact, harass and intimidate Plaintiff and interfere with Plaintiff's ability to conduct his business and maintain a livelihood.

81.   The Jezebel Defendants screens its commenters for inflammatory/defamatory posts, selects those who are most inflammatory and defamatory, and encourages these already defamation-prone commenters to post more comments and continue to escalate the dialogue.

82.   Certain commenters may actually be Jezebel Defendants' employees, posting under an alias, and on information and belief, several defamatory statements about Mr. Huon by unidentified "commenters" are actually Jezebel Defendants'' employees. Plaintiff believes that discovery will reveal this to be the case.

83.   The Jezebel Defendants encourage and create an environment where defamation flourishes.  The Jezebel Defendants promote posts from commentators that are the most inflammatory.  The commentators feed off of one another's inflammatory comments to the point of committing major defamations against the subject of the story.

84.   Defendant, Nick Denton, the founder of Gawker Media and "Gawker plans a business model based on comments and conversation, not posts and ads.

http://www.poynter.org/latest-news/mediawire/174904/gawker-plans-a-business-model-based-on-comments-and-conversation-not-posts-and-ads/.

85.   According to Reuters, the Jezebel Defendants want to monetize comments:

In an internal memo on Thursday, Denton announced the formation of a new sales unit that will focus on helping advertisers and brands take part in the new commenting system…

According to the memo, Gawker is creating a new content unit within the sales department that will be headed by Ray Wert, formerly editor of the Gawker-owned automotive blog Jalopnik. This new unit will take over responsibility for all of Gawker's branded content functions, as well as marketing communications and events — and the purpose of the unit will be to promote the new Gawker discussion platform as a way for marketers and brands to engage with customers in an open forum. Says Denton:

> We all know the conventional wisdom: the days of the banner advertisement are numbered. In two years, our primary offering to marketers will be our discussion platform.

http://blogs.reuters.com/felix-salmon/2012/05/22/how-gawker-wants-to-monetize-comments/.

86.     Reuters described the Jezebel Defendants' commenting system designed to generate more money with advertisers:

So Gawker's new commenting system is based around threads, with the default view being the main, most interesting thread. It's possible to click through to other threads, and every thread — indeed, every comment — has its own unique URL; what's more, the person who starts a thread has quite a lot of control over which comments in that thread will get featured.

What that means is that if an advertiser buys a sponsored post — and sponsored posts have been part of Gawker's menu of offerings for some time now — then once the new commenting system is in place, the advertiser will have a reasonably large degree of control of the conversation that most people see in that post.

http://blogs.reuters.com/felix-salmon/2012/05/22/how-gawker-wants-to-monetize-comments/.  Exhibit "F".

87.     Defendants state on its website that it is the policy of the Defendants to only post comments that Defendants "love":

How do I get approved to comment?

We only approve the comments we love—so make sure you're adding something of quality to the post. Stay on-topic and seek to further the conversation. Leave us a juicy story on the #tips page or throw your hat into the ring of our open forums . . .

Do you have any tips for auditioning?

Leaving multiple high-quality comments on different threads with your newly created account increases your chances of getting approved.   See attached Group Exhibit "E".

88.     The Jezebel Defendants control, block, edit and promote the comments that users can leave regarding the article.   Defendants promote some comments and do not publish other comments. Defendants can promote certain comments by users, placing the comments at the top of the page or in a prominent location for all readers to view.   Defendants have "Featured" and "Promoted Discussion" Comments.   See attached Group Exhibit "E".

89.     In this case, the Jezebel Defendants promoted defamatory comments or inflammatory comments regarding Mr. Huon, thereby encouraging users to post more defamatory comments regarding Mr. Huon.

90.     Defendants intentionally promoted, moderated, edited and/or selected comments that called Mr. Huon a rapist and that defamed Mr. Huon:

a.     SarahMc, wrote:

Just because a man is acquitted of rape does not mean he did not commit rape. That a jury would decide "not guilty" does not magically erase what he did--if he did, in fact, rape

someone. The vast majority of rapists are never convicted of rape. Does that make them not rapists?

b.      Dinosaurs and Nachos, girlfriend!, wrote: Innocent until proven guilty is a widely misunderstood concept. It basically means that the mere fact that someone is charged with a crime is not itself evidence that the person committed a crime.

Then you go to court. In court, there will be evidence presented. This evidence is where an actual, legal determination is made. Nobody is declared "innocent" in a court of law, they are found guilty or not guilty.

"Not guilty" is absolutely not the same thing as "innocent" from a legal standpoint. Those words do not mean the same thing in the world of law. "Innocent until proven guilty" is merely a concept for laymen to try to keep their non-lawyer brains from jumping to (non-legal) conclusions.

c.      SorciaMacnasty, wrote: Nevermind "serial rapist," he sounds like a foreal crazy person.

d.      deafblindmute, wrote:   According to the link under "strength" he traveled to another city, used a false name, and then pretended to be a representative of a liquor company and advertised a job for a model. Now, that doesn't mean that he did/didn't rape her, but it is a goddamn shady way to start off an evening.

He must have had some damn good lawyers to push that out of the jury's mind.

My big question is, if she tried to run from him that night and he acknowledges that they were together and there was some sexual interaction going on, what was his defense? I don't care how drunk you are, in the middle of a wanted sexual encounter you don't jump out of a moving car and run through a cornfield barefoot (fun fact: the bristly hair on corn

leaves feel like thousands of needles when you run through it). I mean, it's sort of his word against hers for what was happening in the car, but we know that a third person saw her after she ran from him.

Any more legally knowledgeable people know how a jury is supposed to treat this type of evidence? Does the fact that its word vs. word in the car disqualify her claims to being assaulted even though she ran away from him and said she was assaulted that night? How can any sexual assault case be tried if that counts as reasonable doubt?

Arg this is more perplexing the more I think about it. Everything points to rape (his shady actions and lies earlier in the night; her running from him to a stranger), but there is no conclusive evidence I have heard speak of that proves he did/didn't do it.

God, it's almost as if our legal system is imperfect or something :/

e.      CassandraSays, writes:

Thanks, bartender and lawyer, for reminding me that since I have a vagina I'm not allowed to go out in public and attempt to engage in any sort of enjoyable activity unless I'm willing to have sex. With anyone who asks - my presence in a bar gives blanket permission to any guy who happens to find me attractive. I mean, if I didn't want to be raped I'd just stay at home, right?

f.      lanboyo, writes:   So he is actually upset about the "Serial" rapist part, actually he is just a one time accused rapist.

g.      JadeSays, writes:

Weird. I didn't know "where do I go to have fun" meant the same thing as "where do I go to get raped." It's great that that jury made that clear to me, otherwise I could get myself in some sticky situations like apparently accidentally begging to be raped. AWE. SOME.

h.      rachel723, writes:

you know it's women like you who don't understand the rules that make the rest of us

ladies look bad.

I'm glad you learned before you actually got raped not to complain now if you do, you

were asking for it!!

/sarcasm

i.      vikkitikkitavi, writes:

She jumped out of a moving car, leaving her shoes and purse behind and ran barefoot

through a cornfield and pounded on a stranger's door to help her?

Fuck this "he's been acquitted" noise. He's a rapist alright, so we may as well call him

one.

j.      tomsomething, writes:

I know you're going to get a million comments like hits, but the phrase "acquitted rapist"

probably won't fly for a person who has already demonstrated his letigiousitousnicity.

k.      cool_as_KimDeal, writes:

Well shit! I didn't know kicking back at a bar and asking where I should go to have fun

meant that I hereby consent to any and all sexual activity, with anybody, with this

bartender here as my witness. Can I sign away my right to consent here on my bar tab?

Okay, great.

l.      HeartRateRapid, writes:

Yea, all those crazy bitches going to the cops and lying about being raped. Except that

false reports for stolen cars are more common. False rape reports make up less than 3% of

all reported rapes, and as I'm sure you know, it horrendously underreported.

33

Exhibit "G".

91.    The Jezebel Defendants blocked and prevented Mr. Huon from posting a reply under his legal name.

92.    The Jezebel Defendants strategy is to monetize comments by encouraging, promoting, editing, and publishing defamatory posts by its users directed at the subject of its post. The Jezebel Defendants' strategy for monetizing the comments from advertisers is to have a comment and discussion section that is larger in length than the original post.   The Jezebel Defendants promote the most inflammatory posts to encourage more posting, thereby, creating more monetizing opportunities from its sponsored advertising.

93.    The Jezebel Defendants' written policy states that its Comments and Discussion Section is by "invitation" only:

7. Comments – The comments sections on GM Sites are accessible to users by invitation only (such invitations coming either from Gawker Media editors directly or by referral from existing comment users). Gawker Media's comment user registration system has been designed so that, if the user so chooses, they can remain completely anonymous, even to us. Gawker Media will not accept responsibility for information posted in the Comments. In order to make our comments useful and interesting, the following guidelines have been established for comment users:

a. Do not post threatening, harassing, defamatory, or libelous material.

b. Do not intentionally make false or misleading statements.

c. Do not offer to sell or buy any product or service.

d. Do not post material that infringes copyright or any other intellectual property interest.

e. Do not post information that you know to be confidential or sensitive or otherwise in breach of the law.

f. Keep all comments relevant to the particular GM Site where the comment is being posted.

Please note that once you post a comment to one of our sites, it becomes part of the public conversation. Our policy is that we will not remove a user's comments unless we deem them to be in violation of our Terms of Use. So if you want to say something that you will later regret personally, it is advisable that you use a username that does not identify you. We cannot remove your comments simply because you have a change of heart about making them.

Additionally, it is our policy not to delete comment accounts. Gawker Media, however, reserves the right to remove comments and comment accounts entirely at its discretion, including for alleged violations of Terms of Use or legal rights.

Gawker Media is not responsible for the content of user comments. If a third party complains that your comment violates our Terms of Use or their rights, we will invite them to respond in the comments themselves. If they pursue the complaint, we will make reasonable efforts to contact you by the means you have provided us, to alert you to the situation. We will protect your contact information as described in our Privacy Policy, but may be compelled to turn it over pursuant to legal process.

94.     The terms and conditions of the Jezebel Defendants' Comments and Discussion Section is under the Advertising link for Jezebel.com:  http://advertising.gawker.com/legal/.

95.     The Jezebel Defendants violated is own terms and conditions by defaming Mr. Huon and encouraging its users to harass and defame Mr. Huon.

96.     Defendants, and each of them, engaged in a deliberate campaign to defame and besmirch Plaintiff's name and reputation by disseminating, publishing and republishing Actionable and Offensive Statements about Plaintiff as more fully set forth herein below.  Moreover, the Gawker Media Defendants engaged in a deliberate campaign to relentlessly and unreasonably intrude into Plaintiff's right of privacy.

97.     The Jezebel Defendants promoted the following comment:
a/k/a Andpreciouslittleofthat, posted and edited a post to read: "Ed: Two seconds of proper Googling will get you to Mr. Huon's firm webpage, complete with his phone number, should you want to call and offer any critiques.   Exhibit "H".

98.     The Jezebel Defendants intentionally superimposed the arrest photograph of Mr. Huon on the Abovethelaw.com article so that the words "**Rape Potpourri**" would be next to Mr. Huon's photograph identifying him as a rapist.

99.     The Jezebel Defendants intentionally published and disseminated Mr. Huon's arrest photograph next to the words "Rapist" and encouraged readers to Google Mr. Huon for his address and telephone number for the malicious purpose of harassing and cyberstalking Mr. Huon.

100.    A Google search of "Meanith Huon" results in the Jezebel Defendants' post being the first search result.

101.    Defendants' attorneys published Mr. Huon's date of birth and Social Security Number, in violation of FRCP 5.2, in this action on the publicly accessible Pacer System.  Mr. Huon subsequently filed a Motion to Strike.  [Docket Nos. 109 and 110.]

102.    The Jezebel Defendants' attorneys have admitted in its pleadings that the Jezebel Defendants viewed Mr. Huon as a sex offender and seeks to track  Mr. Huon, who has never been convicted of a felony or misdemeanor:

>   There is certainly a public interest in knowing about alleged sex crimes, and indeed, there has been a great deal of legislative effort and attention to tracking and reporting on sex offenders . . .

>   Huon has targeted for his harassing lawsuits are those who publish on the internet—precisely the place he has used as a stalking ground on at least two occasions, and the very tool he has used in the past for bullying . . .

>   It is understandable that Plaintiff is familiar with the "cyberstalking" statute.  He has, after all been criminally charged with violating it (emphasis supplied) (Defendants' Memorandum, pages 12, 16, Docket No. 58).

103.    Defendants and its attorneys knew or should have known that the aforesaid statement are false.

104.    Defendants' attorneys in its pleadings describe Mr. Huon as a "serial plaintiff who has repeatedly been charged with crimes relating to the sexual abuse of women".   (Defendants' Memorandum, page 25, Docket No. 58).  Defendants and its attorneys knew or should have known that the aforesaid statement are false.

105.    Defendants and its attorneys seem to believe that just because Mr. Huon was falsely arrested, he can defamed, bullied, harassed.  But as the Seventh Circuit noted, "such a rule 'would strip people who had done bad things of any legal protection against being defamed; they would be defamation outlaws.'" Desnick v. American Broadcasting Companies, Inc., 44 F.3d 1345, 1351  (7th Cir. 1995).

106.     The attorney litigation privilege does not cover the publication of defamatory matter that has no connection whatsoever with the litigation. <u>Restatement (Second) of Torts</u> § 586 comment.  <u>Kurczaba v. Pollock,</u> 318 Ill.App.3d 686, (1st Dist. 2000).

107.     The clients are principals, the attorney is an agent, and under the law of agency the principal is bound by his chosen agent's deeds. The rule is that all of the attorney's misconduct becomes the problem of the client.  <u>Bakery Mach. & Fabrication, Inc. v. Traditional Baking</u>, Inc., 570 F.3d 845, 848 (7th Cir. Ill. 2009).  Thus, the Jezebel Defendants are bound by the defamatory statement made by its attorneys that Mr. Huon is an alleged sex offender who needs to be targeted and tracked.

108.     Various versions of the same Jezebel.com article continue to be published and republished and disseminated on the Internet worldwide.

109.     The Jezebel Defendants republished or disseminated the same defamatory article from Abovethelaw.com without explaining that the article contained false statements. Defendants falsely stated that Abovethelaw.com was "sloppy".      Defendant, Abovethelaw.com, disseminated false statements regarding Mr. Huon.

110.     The Jezebel Defendants knew that Mr. Huon sued Abovethelaw.com for publishing a defamatory article replete with false statements and that Mr. Huon was acquitted more than a year ago.  Defendants knew that Mr. Huon filed a false arrest and malicious prosecution lawsuit against Madison County, Illinois and several defendants.   But Defendants continued to make false statements insisting that Mr. Huon was a serial rapist and that  "The lesson learned : Google only takes you so far."

111.     Defendants continued to publish and disseminate the false statements after

38

Abovethelaw.com removed its defamatory statements regarding Mr. Huon.

112. Defendants engaged in retaliatory and vigilante justice by cyberstalking and cyberbullying Mr. Huon, posting his booking photo on its website and encouraging readers to Google Mr. Huon's telephone number and address and to contact him.

113. Defendants continued to call Mr. Huon a "rapist" who had been acquitted and suggested that had the complainant investigated Mr. Huon by other methods besides Google, the complainant would have learned that Mr. Huon was a serial rapist. Defendants knew that Mr. Huon had no prior convictions and had no other arrests for rape.

114. Defendants defamed Mr. Huon and placed him in a false light as a serial rapist who got away with rape when Defendants placed an arrest photograph of Mr. Huon next to the bold title "**Acquitted Rapist Sues Blog for Calling Him Rapist**". Defendants" described the false statements made by Abovethelaw.com ad allegations made by Mr. Huon. Defendants then closed with the words: " The lesson learned : Google only takes you so far" . Defendants falsely intimated and made the false statement that Mr. Huon is a serial rapist, that he got away with rape, and that he was a sex offender who needed to be tracked and reported to members of the general public.

115. Defendants knew that Mr. Huon had sued Madison County, Illinois and several defendants for defamation, false arrest, malicious prosecution but never reported in detail the allegations of the Madison County lawsuit this to its readers by posting a link to the Madison County lawsuit complaint. Defendants conducted no investigation into the allegations. Defendants knew of the allegations in the lawsuit Mr. Huon filed against Madison County, Illinois and several defendants but never discussed in detail the false arrest or malicious

prosecution of Mr. Huon.   Defendants never contacted Mr. Huon before publishing and disseminating the false statements.

116.    Defendants knew that Abovethelaw.com had published false statements regarding Mr. Huon.   Nevertheless, Defendants rushed to judge and convict Mr. Huon as a rapist in social media.

117.    In fact, the Jezebel Defendants engaged in the same reckless or intentional misconduct as the Abovethelaw Defendants—after being put on notice that the Abovethelaw Defendants made false statements and misread the news stories or posts on the Internet.   The Jezebel Defendants either never read the news stories or intentionally misrepresented the news stories.

118.    Defendants intentionally omitted, among other things, the following facts:

a.    The jury was not allowed to consider the consent defense, because Mr. Huon did not testify and the trial judge barred the consent defense before closing arguments.  Thus, the jury had to have found that no sexual contact took place.

b.    The complainant sustained minor injuries from walking or running in a cornfield.

c.    There was no evidence of a Craigslist ad for a job for promotional modeling.

d.    There was no evidence that Mr. Huon represented himself as a supervisor for an alcohol promotional company.

e.    The video evidence at trial showed Mr. Huon, dressed in shorts, on a Sunday afternoon with the complainant, in a bar.

f.    There was no DNA evidence of semen and the complainant never went to the hospital.

g.      The detectives never interviewed the two key witnesses at the scene who testified at trial that the complainant gave different versions of the alleged incident.

h.      The detectives asked the complainant to call Mr. Huon to arrange a private meeting and to ask for money.

i.      The complainant had gone drinking with Mr. Huon at several bars for hours.

j.      There was no physical evidence presented that the complainant jumped out of a moving car.

k.      There was no evidence of force presented at trial.   The police report stated that complainant alleged that Mr. Huon raised his voice but that Mr. Huon never threatened the complainant.

l.      The photograph of the complainant showed no injuries (besides from her walking in a cornfield barefoot) and   showed her clothes to be completely intact with no tears.

m .      The bartender testified she saw Mr. Huon and the complainant playing video games.

n.      The complainant's boyfriend was arrested in 2008 and  convicted and sentenced in 2009  for possession and intent to distribute cannabis in Federal Court in St. Louis, Missouri.

o.      Mr. Huon was not charged with "rape" to the extent that he was not charged with forcing the complainant to have vaginal sexual intercourse by penile penetration.

p.      The complainant made conflicting statements to two key witnesses—who were never interviewed by the detectives.

119.      Defendants disregarded the complaints from several readers that the article defamed Mr. Huon.

120.     Defendants intentionally defamed Mr. Huon and placed him in a false light to generate website traffic and buzz in its Comments and Discussion Section and, thereby, to increase advertising dollars.

121.     The Jezebel Defendants knew or should have known that certain statements in the aforesaid article were false at the time they were made and published.

122.     Defendants did not make a report of the official proceedings but relied on sources on the Internet. Myers v. The Telegraph, 332 Ill.App.3d 917, 922 (5th Dist. 2002).

123.     Defendants never reviewed the transcript of the official proceedings before making the post.

124.     Some of the aforesaid defamatory matter do not appear in the official record or proceedings.

125.     Some of the aforesaid statements charged Mr. Huon with unfair business practices, impugning his integrity, prejudicing his practice of law, and/or implying that he committed a crime and falls within several of the recognized categories of defamation *per se*. Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d 558, 590 (Ill. 2006).

126.     Defendant posting was not a fair abridgment of the official proceedings and did not convey to readers "a substantially correct account." Restatement (Second) of Torts § 611, Comment f, at 300 (1977).

127.     Defendants' posting  expanded on the official report by the addition of fabricated evidence designed to improve the credibility of the defamation. Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc., 297 Ill.App.3d 314, 310 (1st Dist. 1988).

**Efforts by Plaintiff to Remove Actionable and Offensive Statements**

42

128.     Plaintiff has, on several occasions, contacted one or more of the Abovethelaw

Defendants and the Jezebel Defendants for the purpose of convincing them to remove the

actionable and offensive statements from their respective websites and to convince the Jezebel

Defendants to refrain from engaging in the wrongful acts.  Notwithstanding repeated requests,

Defendants and each of them, failed to remove the actionable and offensive statements from their

respective websites after being requested to do so, and continued to host these websites with the

offensive content and, on information and belief, republished the actionable and offensive

statements and continue to engage in the wrongful acts.

## Public Perception

129.     Since the publication of the actionable and offensive statements, any individual

reading these publications might believe that Plaintiff is a criminal and/or engaged in criminal

activity.

130.     Since the publication of the actionable and offensive statements, any individual

reading the publications might believe that Plaintiff:

        a.     Is a rapist;

        b.     Is a sexual predator;

        c.     Is a sex offender;

        d.     Lacks the integrity or ability to perform and/or discharge his duties as
an attorney;

        e.     Lacks the integrity or ability to perform and/or discharge his duties as
a business consultant; and

        f.     Lacks the integrity or ability to perform in his trade, profession, and
business.

Plaintiff remains concerned that individuals and organizations including prospective

legal clients will choose not to utilize his services based upon the actionable and offensive

statements.

## Intent and Actual Malice

131.     Defendants, and each of them, acted with intent and actual malice in that they have tried and actively continue to try to cause substantial personal and professional harm to Plaintiff. Defendants, and each of them, had every opportunity to investigate the reliability and accuracy of the publications but failed to do so.

132.     Defendants acted with the intent to tortuously interfere with Plaintiff's business interests by dissuading prospective parties who read the publications, from becoming Plaintiff's clients and or doing business with him.

## The Harm Suffered By Plaintiff

133.     As a result of the actionable and offensive statements, Plaintiff has suffered a loss of reputation and business. In the legal and business community integrity, honesty and trust constitutes a substantial component of both retaining clients and obtaining new business.  The actionable and offensive statements make Plaintiff appear to be a criminal, a sexual predator, a sex offender, dishonest and someone you would never want to do business with.

134.     The actionable and offensive statements by Defendants have proximately caused Plaintiff to suffer damages including a decline in prospective business, loss of job or economic opportunities, loss of clients and business deals.  Furthermore, the actionable and offensive statements have negatively affected Plaintiff's personal relationships and have caused him to experience shame, severe emotional distress, loss of social status, esteem, and impairment of normal social functioning.

135.     Plaintiff's damages including both economic and personal injury damages, are unknown at this time and have not yet been fully realized, but are believed to be well in excess of Seventy-Five Thousand Dollars ($75,000.00).

## Plaintiff's Need For Injunctive Relief

136.     Although Plaintiff seeks compensatory and punitive damages, Plaintiff has not adequate remedy at law. Consequently, injunctive relief is necessary.

137.     Plaintiff has suffered and will continue to suffer irreparable harm if this Court Does not enjoin Defendants from publishing the actionable and offensive statements and enjoin the wrongful acts.  Plaintiff's livelihood, profession, business, personal life and relationships, personal well-being and health will continue to be disrupted, negatively affected and substantially injured as a result of Defendants' actionable and offensive statements and the wrongful acts.

138.     Plaintiff will suffer irreparable harm in the absence of appropriate injunctive relief.  In contrast, Defendants will suffer no harm, because they have no legal right to engage in the publication of the actionable and offensive statements or to engage in the Wrongful Acts.

## CLAIMS FOR RELIEF

## COUNT I

### (Defamation *Per Se* Against All Defendants)

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended Complaint as paragraphs 1 to 138 of Count I as though fully set forth herein.

139.     Defendants, and each of them, published the actionable and offensive statements on  the Internet which were viewed by third parties.

140.     The actionable and offensive statements include verifiably false statements the defamatory character of which is apparent on its face and which are susceptible to only one meaning and are of such a nature and character as to impute:

      a.        Criminal wrongdoing to Plaintiff;

b.  False accusations of fornication;

c.  That Plaintiff is unable to perform or lacks integrity in performing his employment duties; and/or

d.  That Plaintiff lacks ability or otherwise prejudices him in his profession. The actionable and offensive statements, therefore, constitute defamation *per se*.

141.  The actionable and offensive statements prejudice Plaintiff and impute a lack of ability to perform in his trade as an attorney or as a businessman.

142.  The actionable and offensive statements are so obviously harmful to Plaintiff that injury to Plaintiff and Plaintiff's integrity, virtue, human decency, respect for others and reputation within the legal and business community and elsewhere may be presumed.

143.  Defendants, and each of them, published the actionable and offensive statements without any cloak of privilege and with actual malice.

144.  The contents of the posts and comments were defamatory and false.

145.  The publication of the posts and comments constitute publications by Defendants.

146.  The erroneous and inflammatory comments concerning Mr. Huon were applied to Mr. Huon on the entire web page .  Any and all viewers of the article understood the defamatory (i.e. criminal, loathsome, immoral) meaning of the erroneous inflammatory information concerning Mr. Huon.

147.  Mr. Huon sustained special harm as a result of the publication of the erroneous and inflammatory communications by Defendants, including, but not limited to, the loss of his professional reputation.

148.  As a result of Defendants' conduct and the publication of the actionable and offensive statements, Plaintiff has suffered and continues to suffer damages including but not limited to, impairment of reputation and standing in the community, loss of business and harmed

46

reputation, personal humiliation, mental anguish and pain and suffering.

149.    The actionable and offensive statements further convey a perception that Plaintiff exercises poor judgment as an attorney, has repeatedly committed sexual assault and will do so in the future, and that he is unable to responsibly carry out his fiduciary duties and obligations to his clients, the courts, his colleagues and the community.

150.    In addition to compensatory and punitive damages in a sum well in excess of the jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

    a.    Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

    b.    Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

    c.    Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

# COUNT II

## (Defamation *per quod* Against All Defendants)

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended Complaint as paragraphs 1 to 138 of Count II as though fully set forth herein.

139.    Defendants, and each of them, published the actionable and offensive statements on the Internet, which were viewed by third parties.

140.    Actionable and offensive statements include verifiably false statements which would be interpreted by the read as defamatory.   Specifically those persons who read the Actionable and offensive statements would construe the statements in such a way so as to impute to Plaintiff a history of criminal wrongdoing and rate.  Furthermore, persons who read the Actionable and offensive statements, would impute to Plaintiff a lack of ability to perform in his

47

trade, and an attorney or as a businessman and would further impute to Plaintiff a lack of integrity, virtue, human decency, and respect for others such that persons reading these statements would not want to deal with Plaintiff either as a lawyer or as businessman.

141.    Defendants and each of them publish the actionable and offensive statements without any cloak of privilege, with actual malice, and with the intent to injury Plaintiff's business and reputation in the legal and the business community.

142.    The actionable and offensive statements published by Defendants and each of them, have directly and proximately caused harm to Plaintiff's professional standing amongst lawyers and businessman and has damaged Plaintiff's reputation for honesty and integrity, and has caused injury to Plaintiff's legal practice, business operations and good will and have injured the public's confidence in Plaintiff.

143.    The contents of the posts and comments were defamatory in that the above-mentioned statements were false.

144.    Each of the above statements contained in the posts that are of and concerning Mr. Huon is false, untrue, and defamatory, and the posts are libelous on their face .

145.    The Defendants, and each of them, jointly or separately, knew the statements as they apply to Mr. Huon to be false, and that the posts were intended by the Defendants to convey false or defamatory statements about Mr. Huon.

146.    The Defendants, and each of them, jointly or individually, wrote, printed, published and circulated, or caused to be written, printed, published and circulated, the libelous statements concerning Mr. Huon either with knowledge of the falsity of the statements or with reckless disregard for their truth.

147.    The statements were so understood by those who read them to have the defamatory meaning ascribed to them in this complaint and the Defendants, and each of them, jointly or separately, intended the statements   to be so understood and read by users and visitors of the website.

148.    The Defendants, and each of them, jointly or separately, intended the statements to be so understood and read by who read the statements via third-party distribution, where permission for such further distribution was known and encouraged by the Defendants.

149.    At the time the statements were publicly distributed throughout the world, the Defendants, and each of them, jointly and separately, were in possession of evidence that would raise serious doubt about the truth of the statements made. Nevertheless, the Defendants, and each of them, jointly and separately, without due regard for the truth, falsity, or malicious nature of the statements, formulated, published, and disseminated the statements.

150.    The defamatory statements were written and published with reckless disregard for the truth of the matter, and Defendants knew at the time the statements were formulated that they were false and injurious to Plaintiffs. The statements were intended by Defendants, and each of them, to directly injure Mr. Huon with respect to Mr. Huon' reputation, character, and business.

151.    Defendants, each of them, were also negligent in publishing the statements. With ordinary and reasonable care, Defendants would have realized, or could have discovered, that the statements pertaining to Mr. Huon were obviously false and grossly libelous, offensive and damaging to Mr. Huon.

152.    The defamatory statements   were not privileged in any manner. The statements were intended by Defendants, and each of them, to directly injure Mr. Huon with respect to his reputation, character, and business.

153.    As a legal result of the intentional and malicious conduct of the Defendants, and each of them, jointly and separately, Mr. Huon has suffered damage to business, trade, profession and occupation, all to Mr. Huon's special damages in a sum to be determined at time of trial.

154.    By engaging in the misconduct alleged above, the Defendants each engaged in unjust and deceitful conduct with the willful and conscious disregard for the rights of Mr. Huon. Defendants were aware of the probable dangerous consequences of their misconduct and willfully and deliberately failed to avoid those consequences, including subjecting Mr. Huon to

49

cruel and unjust hardship, in conscious disregard of Mr. Huon's rights. Thus, an award of exemplary and punitive damages is justified.

155.     The publication of the articles constitute publication by Defendants.

156.     The erroneous and inflammatory comments concerning Mr. Huon were applied to Mr. Huon on the entire web page .   Any and all viewers of the article understood the defamatory (i.e. criminal, loathsome, immoral) meaning of the erroneous inflammatory information concerning Mr. Huon.

157.     Mr. Huon sustained special harm as a result of the publication of the erroneous and inflammatory communications by Defendants, including, but not limited to, the loss of his professional reputation.

158.     Moreover, as the result of the defamatory publication referred to herein, Mr. Huon has sustained irreparable harm to his reputation, emotional distress and loss of standing in the community.

159,     Defendants acts described herein were reckless, outrageous, willful, and malicious, warranting the imposition of punitive damages.

160.     Plaintiff has, and will suffer, special damages and pecuniary loss directly from a loss of clients in his legal practice and the loss of profit from business deals and interactions in an amount well in excess of Seventy-Five Thousand ($75,000.00).

161.     Publication of the actionable and offensive statements by Defendants, and each of them, was done knowingly, willfully, maliciously, wantonly, and with the intent to confuse, mislead or deceive potential clients and business associates, and to create a false impression as to the nature of Plaintiff's integrity and virtue, and to disparage Plaintiff's reputation before the public and specifically within the legal and business community.

162.     In addition to compensatory and punitive damages in a sum well in excess of the jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

          a.     Compelling Defendants, and each of them, to remove the actionable and

50

offensive statements from the Internet;

   b. Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

   c. Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT III

### (Invasion of Privacy – False Light - Against All Defendants)

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended Complaint as paragraphs 1 to 138 of Count III as though fully set forth herein.

139. Defendants, and each of them, published the actionable and offensive statements on the Internet which were viewed by third parties.

140. The actionable and offensive statements include verifiably false statements susceptible to only one meaning, that are of such a nature and character as to invade Plaintiff's privacy by placing Plaintiff in a false light before the public.

141. The actionable and offensive statements are so obviously and naturally harmful to Plaintiff that injury to Plaintiff, and Plaintiff's integrity, virtue, human decency, respect for others, reputation within the legal and business community and elsewhere may be presumed.

142. The false light in which the actionable and offensive statements placed Plaintiff would be highly offensive to the reasonable person.

143. Defendants' published the actionable and offensive statements without any cloak of privilege, with actual malice, with knowledge of or with reckless disregard for the falsity of the statements.

144. In light of the forgoing, Defendants, and each of them, have invaded Plaintiff's

privacy by placing Plaintiff in a false light before the legal and business community and before the public.

145.    In intentionally or recklessly stating and intimating the above-mentioned false statements,   Defendants invaded Mr. Huon's privacy by portraying him in a false light.

146.    The false light in which Defendants portrayed Mr. Huon would be highly offensive to a reasonable person.

147.    Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Mr.   Huon would be placed.

148.    The publicity created by Defendants, and each of them, jointly or separately, placed Plaintiff in a false light in the public eye in that the reports were fabricated by Defendants, and each of them, and publicly conveyed, and was intended to convey, a calculatedly false and inaccurate impression of Mr. Huon as criminal and immoral person.

149.    The publicity created by the statements were highly objectionable to Mr. Huon, and would be to any person of ordinary sensibilities. The statements made Mr. Huon the object of scorn and ridicule by many residents of the Illinois and the United States and the world. The reports were intended to and did directly injure the Mr. Huon with respect to Mr. Huon's  right to be left alone, as well as the Mr. Huon's reputation, character, and business.

150.    The formulation, publication, and public dissemination of the statements   by the Defendants was done with actual malice in that it was done with all or some of Defendants' knowledge of the reports' falsity, or in reckless disregard of the truth. At all relevant times, all or some of the Defendants were aware, or should have been aware, of facts contrary to the Defendants' malicious allegations.

151.    The publicity created by Defendants, and each of them, was done with malice in that it was made either with knowledge of the falsity of the statements or in reckless disregard of the truth. The statements describing Mr. Huon's actions, character and intention were calculated falsehoods.

52

152.     Defendants, and each of them, were also negligent in publishing the statements. With ordinary and reasonable care, Defendants would have realized, or could have discovered, that the reports were obviously false and grossly libelous, offensive, and damaging to Mr. Huon.

153.     As a legal result of the statements, Mr. Huon has suffered a loss of social status, esteem, and acceptance, causing him to experience shame, severe emotional distress, and impairment of normal social functioning, all to his general damages in a sum not determined at this time, but in excess of $75,000.00.

154.     As a further legal result of the above-mentioned disclosure, Mr. Huon has suffered injury in his business, all to the Mr. Huon's special damages in an amount to be proven at trial.

155.     In making the disclosure described above, Defendants, and each of them, are guilty of unjust and deceitful conduct amounting to oppression, fraud, or malice in that defendants made the disclosure with a willful disregard of Mr. Huon's rights. Defendants' acts in formulating, publishing, and disseminating the statements on their website, and in their allowing other websites and entities to freely reprint their materials, were done with the knowledge by defendants that these acts would cause Mr. Huon to suffer great humiliation, mental anguish, and injury. Defendants' acts were therefore willful, wanton, intentional, and actually malicious and oppressive, justifying the award of exemplary and punitive damages according to proof at trial.

156.     As the result of so portraying Mr. Huon, Mr. Huon sustained severe personal injuries including, but not limited to, emotional distress, irreparable damage to his reputation, loss of standing in the community, and injury to his professional reputation.

157.     Defendants, and each of them, jointly and individually, wrote, printed, published, circulated, and continue to make available on their websites the defamatory statements for the purpose of, among other things, injuring Mr. Huon's reputation, injuring and interfering with his r businesses, and publicly embarrassing and humiliating Mr. Huon. Defendants did so in furtherance of their agenda of preserving their influence worldwide and locally in social media, to generate website traffic, to generate advertising dollars, to sell more newspapers, and/or to

advance their own material and economic advantage.

158.     Defendants' widespread and continued dissemination of statements that Mr. Huon is a guilty of criminal and immoral conduct has exposed Mr. Huon to contempt, ridicule and embarrassment, injury to their reputations and economic loss.

159.     The impact of Defendants' defamatory statements is particularly severe as a result of the fact that many readers of the websites are lawyers, attorneys, judicial clerks, law clerks, decision makers, businessmen or individuals employed in business and legal community.

160.     The aforesaid conduct by Defendants, and each of them, was undertaken with the specific intent to cause injury to Mr. Huon, and that such conduct was despicable and carried out with willful and conscious disregard of Plaintiffs' rights and feelings and with ill-will, all of which constitutes "malice."

161.     The foregoing conduct by Defendants, and each of them, was also intended to and did subject Mr. Huon to unjust hardship in conscious disregard of Mr. Huon's rights and, as such, constituted "oppression." As a direct and proximate result of Defendants' actions, Mr. Huon's reputations, which is vital for the continuing success of his profession and business, have been severely damaged by Defendants' conduct. By reason of such ill-will, malice and oppression, Mr. Huon is entitled to punitive or exemplary damages against Defendants, and each of them, in an amount sufficient to punish them and deter them from further similar conduct.

162.     Defendants'' acts of defaming Mr. Huon were reckless, outrageous, willful, and malicious, warranting the imposition of punitive damages.

163.     In addition to compensatory and punitive damages in a sum well in excess of the jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

          a.     Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

          b.     Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

c.    Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT IV

### (Invasion of Privacy – Unreasonable Intrusion Upon the Seclusion of Another - Against the All Defendants)

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended Complaint as paragraphs 1 to 138 of Count IV as though fully set forth herein.

139.    The Defendants engaged in acts of wrongdoing identified in the aforesaid paragraphs in an effort to intentionally, unreasonably, and without authorization, intrude into Plaintiff's seclusion and/or to otherwise pry into Plaintiff's seclusion and right of privacy.

140    The wrongful acts by the   Defendants are offensive and objectionable to a reasonable person.

141.    The wrongful acts by the   Defendants constitute an unreasonable intrusion upon the private matters of Plaintiff.

142.    In light of the foregoing, the Defendants, and each of them, have invaded Plaintiff's privacy thereby proximately causing Plaintiff personal pain, anguish, suffering, humiliation, loss of reputation, loss of business and impairment of standing in the community.

144.    In addition to compensatory and punitive damages in a sum well in excess of the jurisdiction of this Court, Plaintiff is entitled to injunctive relief enjoining the Defendants from engaging in the wrongful acts identified in the aforesaid paragraphs.

## COUNT V

### (Intentional Infliction of Emotional Distress Against All Defendants)

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended  Complaint as paragraphs 1 to 138 of Count V as though fully set forth herein.

139.    The actionable and offensive statements and the wrongful acts constitute conduct by Defendants, and each of them, that was extreme and outrageous.

140.    In publishing the actionable and offensive statements and engaging in the wrongful acts, Defendants intended to cause Plaintiff emotional distress and/or recklessly or consciously disregarded the probability that their acts would cause Plaintiff emotional distress.

141.    Defendants' acts of perpetuating false and inflammatory information concerning Mr. Huon, specifically constituted extreme and outrageous conduct.

142.    As a legal result of the intentional and malicious conduct of the Defendants, and each of them, jointly and separately, Mr. Huon has suffered damages.

143.    As an actual and proximate result of the acts of Defendants, and each of them, as herein alleged, Plaintiff has suffered severe and extreme emotional distress.

144.    In addition to compensatory and punitive damages in a sum well in excess of the jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

    a.    Compelling Defendants, and each of them, to remove actionable and offensive statements from the Internet;

    b.    Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

    c.    Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT VI

### (Conspiracy to Defame Plaintiff Against All Defendants)

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended Complaint as paragraphs 1 to 138 of Count VI as though fully set forth herein.

139.    Defendants agreed between and among themselves, and with each other, to publish the actionable and offensive statements for the unlawful purpose of defaming Plaintiff

and injuring Plaintiff's integrity, virtue, human decency, respect for others and his reputation within the legal and business community and dissuading the public from contacting, communicating or associating with Plaintiff.

140. Defendants together, and each of them individually, published one or more of the actionable and offensive statements in furtherance of this common scheme, and Defendants together, and each one of them individually, did so knowingly and willfully.

141. Defendants conspired to and did publish the actionable and offensive statements without any cloak of privilege and with actual malice.

142. In addition to compensatory and punitive damages in a sum well in excess of the jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

a. Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

b. Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

c. Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT VII

### (Conspiracy to Invade Plaintiff's Privacy – False Light - Against All Defendants)

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended Complaint as paragraphs 1 to 138 of Count VII as though fully set forth herein.

139. Defendants agreed between and among themselves, and with each other, to publish the actionable and offensive statements on the Internet for the unlawful purpose of invading Plaintiff's privacy by placing Plaintiff in a false light, and injuring Plaintiff's integrity, virtue, human decency, respect for others and reputation within the legal and business community, and elsewhere, dissuading members of the public from contacting, communicating,

or associating with Plaintiff.

140.    Defendants together, and each one of them individually, published one or more of the actionable and offensive statements on the Internet in furtherance of this common scheme and Defendants together, and each one of them individually, did so knowingly and willfully.

141.    Defendants conspired to and did so publish the actionable and offensive statements without any cloak of privilege and with actual malice.

142.    In light of the foregoing, Defendants did knowingly and willfully participate in a common scheme to commit an unlawful act against Plaintiff.

143.    In addition to compensatory and punitive damages in a sum well in excess of the jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

    a.    Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

    b.    Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

    c.    Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT VIII

**(Tortious Interference With Plaintiff's Economic Advantage Against All Defendants)**

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended Complaint as paragraphs 1 to 138 of Count VIII as though fully set forth herein.

139.    At all times material hereto, Plaintiff held a reasonable expectation of entering into valid business relationships, both in his legal practice and in business.

140.    Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, had knowledge of Plaintiff's expectancy of entering into valid business relationships with

58

members of the public including, but not limited to, his retention as an attorney.

141.     Publication on the Internet of the actionable and offensive statements by Defendants were made by Defendants with a reasonable expectation that prospective clients and business associates and potential employers of Plaintiff who read the actionable and offensive statements would choose not to interact with Plaintiff.

142.     Defendants, and each of them, knowingly, purposefully, maliciously and intentionally, published the actionable and offensive statements in order to prevent Plaintiff from securing new clients and creating new business relationships.

143.     Defendants, and each of them, acted with the intent to tortuously interfere with Plaintiff's business interests by dissuading prospective clients and prospective business associates and potential employers from becoming Plaintiff's legal clients and business partners or associates and from hiring Plaintiff.

144.     The actionable and offensive statements constitute an intentional and unjustifiable interference with prospective clients and business partners and associates of Plaintiff and caused prospective clients and business partners and associates to refrain from contacting and or doing business with Plaintiff.

145.     As a proximate result of Defendants' conduct and publication of the actionable and offensive statements, Plaintiff has suffered and continues to suffer damages including, but not limited to, loss of prospective business.

146.     In addition to compensatory and punitive damages in a sum well in excess of the jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

          a.     Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

          b.     Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

          c.     Enjoining Defendants, and each of them, from interfering with Plaintiff's

law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT IX

### (Cyberstalking and Cyberbullying Against All Defendants)

1 to 138.  Plaintiff repeats and realleges paragraphs 1 to 138 of this Third Amended Complaint as paragraphs 1 to 138 of Count IX as though fully set forth herein.

139.    Illinois has enacted a law to protect people from Cyberbullying or Cyberstalking.

140.    Sec. 12-7.5. Cyberstalking provides as follows:

(a) A person commits cyberstalking when he or she **engages in a course of conduct using electronic communication directed at a specific person**, and he or she knows or should know that would cause a reasonable person to:

(1) fear for his or her safety or the safety of a third person; **or**

**(2) suffer other emotional distress**.

(a-3) A person commits cyberstalking when he or she, knowingly and without lawful justification, **on at least 2 separate occasions**, **harasses another person through the use of electronic communication** and:

(1) at any time transmits a threat of immediate or   future bodily harm, sexual assault, confinement, or restraint and the threat is directed towards that person or a family member of that person; or

(2) **places that person or a family member of that person in reasonable apprehension** of immediate or future bodily harm, sexual assault, confinement, or restraint; or

60

(3) at any time knowingly **solicits the commission of an act by any person which would be a violation of this Code directed towards that person** or a family member of that person.

(a-5) A person commits cyberstalking when he or she, knowingly and without lawful justification, **creates and maintains an Internet website or webpage which is accessible to one or more third parties for a period of at least 24 hours, and which contains statements harassing another person** and:

(1) which communicates a threat of immediate or future bodily harm, sexual assault, confinement, or restraint, where the threat is directed towards that person or a family member of that person, or

(2) **which places that person or a family member of that person in reasonable apprehension** of immediate or future bodily harm, sexual assault, confinement, or restraint, or

(3) **which knowingly solicits the commission of an act by any person** which would be a violation of this Code directed towards that person or a family member of that person.

(b) Sentence. Cyberstalking is a Class 4 felony; a second or subsequent conviction is a Class 3 felony.

(c) For purposes of this Section:

(1) "Course of conduct" means 2 or more acts, including but not limited to acts in which a defendant directly, **indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to** or about, a person, engages in other non-consensual contact, or interferes with or damages

a person's property or pet. The incarceration in a penal institution of a person who commits the course of conduct is not a bar to prosecution under this Section.

(2) "Electronic communication" means any transfer of   signs, signals, writings, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system. **"Electronic communication" includes transmissions by a computer through the Internet to another computer**.

(3) "Emotional distress" means significant mental   suffering, anxiety or alarm.

(4) "Harass" means to engage in a knowing and willful course of conduct directed at a specific person that alarms, torments, or terrorizes that person.

(5) "Non-consensual contact" means any contact with   the victim that is initiated or continued without the victim's consent, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; or placing an object on, or delivering an object to, property owned, leased, or occupied by the victim.

(6) "Reasonable person" means a person in the victim's circumstances, with the victim's knowledge of the defendant and the defendant's prior acts.

(7) "Third party" means any person other than the person violating these provisions and the person or persons towards whom the violator's actions are directed.

(d) Telecommunications carriers, commercial mobile service providers, and providers of information services, including, but not limited to, Internet service providers and hosting service providers, are not liable under this Section, except for willful and wanton

misconduct, by virtue of the transmission, storage, or caching of electronic communications or messages of others or by virtue of the provision of other related telecommunications, commercial mobile services, or information services used by others in violation of this Section. (Source: P.A. 95-849, eff. 1-1-09; 96-328, eff. 8-11-09; 96-686, eff. 1-1-10; 96-1000, eff. 7-2-10; 96-1551, eff. 7-1-11.)   (Emphasis supplied.)

140.    Defendants engaged in a course of conduct using electronic communication directed at a Mr. Huon when Defendants published false statements of Mr. Huon calling or intimating him as a serial rapist or a rapist, publishing his booking photograph, publishing his address.   Defendants know or should know that would cause a reasonable person to suffer emotional distress.

141.    Pleading in the alternative, Defendants created and maintained an Internet website or webpage which is accessible to one or more third parties for a period of at least 24 hours, and which contains statements harassing Mr. Huon which placed Mr. Huon in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint. Defendants called or intimated that Mr. Huon was a rapist or a serial rapist, published his booking photo, published his address.

142.    The Jezebel Defendants created and maintained an Internet website or webpage which is accessible to one or more third parties for a period of at least 24 hours, and which contains statements harassing Mr. Huon and which knowingly solicits the commission of an act by any person which would be a violation of this Code directed towards Mr. Huon.   Defendants encouraged its users to look up Mr. Huon's telephone number and contact information and harass and cyberstalk him.  Defendants' attorneys published Mr. Huon's date of birth and Social Security Number and personal information on the Pacer website.

143.     As a legal result of the intentional and malicious conduct of the Defendants, and each of them, jointly and separately, Mr. Huon has suffered damages.

**WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment on behalf of Plaintiff and against Defendants, jointly and severally, and to award Plaintiff, on each Count:

1.     Compensatory damages in an amount well in excess of the jurisdiction of this Court and not less than Seventy-Five Thousand Dollars ($75,000.00) ;

2.     Punitive damages in an appropriate amount to punish Defendants;

3.     Injunctive relief :

a.     Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

b.     Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

c.     Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

4.     Costs of suit incurred herein;

5.     Attorney's fees if permissible by law;

6.     The transfer of the domain names Abovethelaw.com, Jezebel.com, and Gawker.com to Plaintiff.

7.     An order for injunctive relief against any individual or entity from posting an article or comment that relies on the defamatory statements of the Defendants as source.

8.     Such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, Meanith Huon,

demands a jury trial on all issues triable.

September 12, 2012

Respectfully submitted,

/s/ Meanith Huon

Meanith Huon
The Huon Law Firm
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
E-mail: huon.meanith@gmail.com
IL ARDC. No.: 6230996

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of September, 2012, I caused to be served a true and correct copy of the foregoing Plaintiff's Third Amended Complaint by causing copies of same to be served electronically on all counsel of record who have appeared in this case.

/s/Meanith Huon_____
Meanith Huon
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
E-mail: huon.meanith@gmail.com