# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MEANITH HUON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 03054 |
| | ) | |
| BREAKING MEDIA, LLC a/k/a BREAKING | ) | Judge John J. Tharp, Jr. |
| MEDIA; BREAKING MEDIA, INC. a/k/a | ) | |
| BREAKING MEDIA; DAVID LAT; ELIE MYSTAL; | ) | |
| JOHN LERNER; DAVID MINKIN; GAWKER | ) | |
| MEDIA, LLC a/k/a GAWKER MEDIA; BLOGWIRE | ) | |
| HUNGARY SZELLEMI ALKOTAST HASZNOSITO | ) | |
| KFT; GAWKER MEDIA GROUP, INC. a/k/a | ) | |
| GAWKER MEDIA; GAWKER ENTERTAINMENT, | ) | |
| LLC; GAWKER TECHNOLOGY, LLC; GAWKER | ) | |
| SALES, LLC; NICK DENTON; IRIN CARMON; and | ) | |
| GABY DARBYSHIRE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Meanith Huon ("Huon"), brings state law claims for defamation and related torts against two groups of defendants: the Above the Law ("ATL") defendants and the Gawker defendants.[1] Huon initially sued the ATL defendants for publishing an allegedly defamatory article on AboveTheLaw.com that discussed his criminal trial for sexual assault charges. He subsequently amended his complaint to include claims against the Gawker defendants for publishing an allegedly defamatory article on Jezebel.com about the filing of this lawsuit against

---

[1] The ATL defendants are Breaking Media, LLC a/k/a Breaking Media; Breaking Media, Inc. a/k/a Breaking Media; David Lat ("Lat"); Elie Mystal ("Mystal"); John Lerner ("Lerner"); and David Minkin ("Minkin"). The Gawker defendants are Gawker Media, LLC a/k/a Gawker Media ("Gawker Media, LLC"); Blogwire Hungary Szellemi Alkotast Hasznosito KFT ("Blogwire Hungary"); Gawker Media Group, Inc. a/k/a Gawker Media ("Gawker Media Group, Inc."); Gawker Entertainment, LLC ("Gawker Entertainment"); Gawker Technology, LLC ("Gawker Technology"); Gawker Sales, LLC ("Gawker Sales"); Nick Denton ("Denton"); Irin Carmon ("Carmon"); and Gaby Darbyshire ("Darbyshire").

the ATL defendants. The current Fourth Amended Complaint (the "Complaint") seeks relief against all the defendants for defamation *per se* (Count I), defamation *per quod* (Count II), false light invasion of privacy (Count III), intrusion upon seclusion (Count IV), intentional infliction of emotion distress (Count V), conspiracy to defame (Count VI), conspiracy to invade privacy (Count VII), tortious interference with prospective economic advantage (Count VIII), and cyberstalking and cyberbullying (Count IX). The ATL defendants have moved to dismiss all the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Several of the Gawker defendants have likewise moved to dismiss all the claims against them. For the reasons stated below, the Gawker defendants' motion to dismiss [174] is granted and the ATL defendants' motion to dismiss [178] is granted in part and denied in part.

## BACKGROUND

Meanith Huon is an attorney licensed to practice law in Illinois.[2] On July 2, 2008, Huon was charged with two counts of criminal sexual assault, two counts of criminal sexual abuse, and one count of unlawful restraint. The charges arose out of his alleged interactions with "Jane Doe" on June 29, 2008, in Madison County, Illinois. *See* Gawker Motion to Dismiss, Dkt. 191, at 25 (Exhibit A). Approximately one year later, on July 17, 2009, Huon was charged with cyberstalking and witness harassment based on allegations involving the same Jane Doe. *See id.*

---

[2] In reviewing a motion to dismiss, the Court may consider: (1) the plaintiff's complaint and any documents attached to it, (2) documents attached to the motion to dismiss that are critical to the complaint and referred to in it, (3) additional facts set forth in the plaintiff's response to the motion or in any documents attached to the response, as long as those additional facts are consistent with the allegations in the complaint, and (4) information that is subject to proper judicial notice (such as public records). *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). When considering these materials, the Court accepts the plaintiff's factual allegations as true and construes all reasonable inferences in favor of the plaintiff. *Gessert v. United States*, 703 F.3d 1028, 1033 (7th Cir. 2013). The factual background is therefore summarized with this standard in mind and, except where otherwise indicated, is drawn from the Complaint (Dkt. 162) and accompanying exhibits (Dkts. 162-1 through 162-21).

at 29 (Exhibit C). Huon was tried on the 2008 sexual assault charges in May 2010 in Madison County. The trial began on May 4 and ended on May 6 with his acquittal on both charges. *See* Exhibit A to ATL Motion to Dismiss, Dkt. 190-1, at 2-4; Exhibit B to ATL Motion to Dismiss, Dkt. 190-2, at 2. The 2009 cyberstalking and witness harassment charges were ultimately dismissed in December 2011.

The charges against Huon and his criminal trial received publicity in local media and legal news sources; several of the resultant articles are relevant to the instigation of this case. On July 2, 2008, the day the sexual assault and related charges were filed, an article about those charges appeared in the *Madison County Record* (the "Madison County Article"). *See* Exhibit C to Response to ATL Motion to Dismiss, Dkt. 194-8. The following day, July 3, 2008, the legal blog AboveTheLaw.com published a post by defendant Lat (the "2008 ATL Post") that included the one-line statement "Lawyer of the Day: Meanith Huon" along with a link to the Madison County Article. Next, on August 24, 2009, a post discussing both the 2008 and 2009 charges appeared on the blog LawyerGossip.com (the "Lawyer Gossip Post"). *See* Exhibit F to Response to ATL Motion to Dismiss, Dkt. 194-13. Finally, on May 6, 2010, AboveTheLaw.com published an article by defendant Mystal titled "Rape Potpourri" (the "ATL Article").

The ATL Article provided information and commentary on two "rape stories": (1) the arrest of former New York Giants linebacker Lawrence Taylor based on a rape allegation, and (2) the allegations at issue in Huon's criminal trial and the opening statement made by Huon's defense lawyer at trial. The section of the ATL Article on Huon purported to link to and quote, *inter alia*, the Lawyer Gossip Post, the Madison County Article (which was also linked to in the 2008 ATL Post), and an article in the *Belleville News Democrat* titled "Testimony: Woman says

she was raped by attorney posing as scout for models" (the "BND Article").[3] At some point following the ATL Article's initial publication, an update was added toward the end of the piece indicating that Huon had been acquitted of the charges discussed.[4] AboveTheLaw.com allows readers to post comments on its articles (subject to certain terms of use), and the ATL Article eventually generated over 107 comments or replies from users.[5]

On May 6, 2011, one year after publication of the ATL Article, Huon sued the ATL defendants and the John Does who posted comments on the ATL Article for defamation, intentional infliction of emotional distress, and false light invasion of privacy.[6] *See* Initial Complaint, Dkt. 1. The filing of this suit, like the criminal charges against Huon, generated its share of publicity. On May 11, 2011, an article by defendant Carmon entitled "Acquitted Rapist Sues Blogger for Calling Him Serial Rapist" appeared on the women's interest blog Jezebel.com (the "Jezebel Article").[7] The Jezebel Article discussed Huon's criminal trial for sexual assault,

---

[3] In his response to the ATL motion to dismiss, Huon disputes the existence of the BND Article. However, the copy of the ATL Article attached as an exhibit to the Complaint reveals that the ATL Article presented the BND Article as one of its sources and indicates the title of the BND Article. Huon does not dispute the ATL Article's reliance on the Madison County Article and Lawyer Gossip Post.

[4] The update stated: "**UPDATE:** Meanith Huon was acquitted of these charges. Please check here for our continuing coverage." The words "check here" appeared in red text, as did other words and phrases in the ATL Article that were presented as hyperlinks.

[5] A saved version of the ATL Article is attached to the Complaint at Dkt. 162-8. The ATL Article is no longer available on AboveTheLaw.com, but it remains available online via the Internet Archive Wayback Machine at http://web.archive.org/web/20100512094544/http://abovethelaw.com/2010/05/rape-potpourri/ (last visited Dec. 4, 2014).

[6] The ATL defendants were served on June 15, 2011. *See* Waiver of Service of Summons, Dkt. 167; Waiver of Service of Summons, Dkt. 167-1. The current Complaint does not name any John Doe defendants.

[7] The headline of the Jezebel Article was changed at some point following the piece's initial publication. Screenshots of the original version are attached to the Complaint at Dkt. 162-12 and at Dkt. 162-16, at 2. The version with the changed headline is still available on Jezebel.com at http://jezebel.com/5800878/man-acquitted-of-sexual-assault-sues-blog-for-calling-him-serial-rapist (last visited Dec. 4, 2014).

his lawsuit against local law enforcement authorities for prosecutorial misconduct, and his initial complaint against the ATL defendants in the instant suit. The Jezebel Article mentioned the title of the ATL Article and included links to the ATL Article and other relevant sources. The Jezebel Article also included an image containing Huon's arrest photograph superimposed over a screenshot of the start of the ATL Article. Users who are invited by Gawker Media editors or by previously invited users may post comments on Jezebel.com articles (subject to certain terms of use), and the Jezebel Article eventually generated over 80 comments or replies from such users. According to Huon, some of the user comments were written by employees of the Gawker defendants, posting under aliases.

On July 11, 2011, two months after publication of the Jezebel Article, Huon filed a First Amended Complaint which added new allegations and defendants related to, *inter alia*, the Jezebel Article and associated comments. The three individual Gawker defendants and "Gawker Media" were among the defendants added to the suit in the First Amended Complaint. Huon soon filed a Second Amended Complaint which removed certain of the other recently added defendants. Gawker Media and the individual Gawker defendants were subsequently served on August 24, 2011. *See* Waiver of Service of Summons, Dkt. 167; Waiver of Service of Summons, Dkt. 167-1.

On September 21, 2011, the ATL defendants moved to dismiss the Second Amended Complaint. Shortly thereafter, Gawker Media, the individual Gawker defendants, and Jezebel.com (which has since been dropped from the suit) likewise filed a motion to dismiss. The two motions to dismiss were fully briefed at the time the case was transferred to this Court's docket on August 3, 2012. Upon reviewing the case, the Court dismissed the Second Amended Complaint without prejudice due to deficiencies in the allegations respecting diversity

jurisdiction. The Court denied the two motions to dismiss as moot in light of that ruling. Huon then filed a Third Amended Complaint which contained updated jurisdictional allegations, added new claims and defendants,[8] and removed some defendants. Since the jurisdictional allegations in the Third Amended Complaint were still insufficient, the Court again dismissed the complaint without prejudice.[9] On November 15, 2012, Huon filed the current Complaint with further updated jurisdictional information. The ATL defendants and certain of the Gawker defendants subsequently filed their respective motions to dismiss which are now under consideration.[10]

Based on the information in the Complaint and the notifications of affiliates filed pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.2, this matter is properly before the Court under diversity jurisdiction in accordance with 28 U.S.C. § 1332. Huon, a citizen of Illinois, is seeking compensatory damages in an amount well in excess of $75,000 and punitive damages of $100,000,000. The corporate ATL defendants are: (1) Breaking Media, Inc., a New York corporation that owns and operates AboveTheLaw.com and has its principal place of business in New York, and (2) Breaking Media, LLC, an inactive limited liability company that has merged into Breaking Media, Inc. The corporate Gawker defendants, which own and/or

---

[8] The defendants added in the Third Amended Complaint were Blogwire Hungary, Gawker Entertainment, Gawker Sales, and Gawker Technology. There is no evidence of service on the docket as to these four defendants, nor have there been any attorney appearances for them. Gawker Entertainment, Gawker Sales, and Gawker Technology are mentioned in the Gawker notification of affiliates filed pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.2; however, Blogwire Hungary is not mentioned in that filing.

[9] The Court provided guidance to Huon as to the jurisdictional deficiencies in his complaints at the time of each dismissal.

[10] The Gawker motion to dismiss was filed on behalf of "Gawker Media a/k/a Gawker.com, Jezebel.com, Nick Denton, Irin Carmon, and Gaby Darbyshire." *See* Gawker Motion to Dismiss, Dkt. 191, at 1. Jezebel.com is no longer named as a defendant in this case. More important to note is the fact that the motion was *not* filed on behalf of the four Gawker defendants that were named for the first time in the Third Amended Complaint. As previously noted, there is no evidence of service as to those four defendants.

operate Jezebel.com, are: (1) Gawker Media Group, Inc., a Cayman Islands corporation that has its principal place of business in New York, (2) Gawker Media, LLC, a limited liability company whose only member is Gawker Media Group, Inc., (3) Gawker Entertainment, a limited liability company whose only member is Gawker Media, LLC, (4) Gawker Sales, a limited liability company whose only member is Gawker Media, LLC, (5) Gawker Technology, a limited liability company whose only member is Gawker Media, LLC, and (6) Blogwire Hungary, a Hungarian entity that is similar to a U.S. limited liability company.[11] The individual ATL defendants—John Lerner, the Chief Executive Officer of Breaking Media; David Lat, the founding and managing editor of AboveTheLaw.com; David Minkin, the publisher of AboveTheLaw.com; and Elie Mystal, a writer and editor for AboveTheLaw.com—are all citizens of New York. Two of the individual Gawker defendants—Gaby Darbyshire, the Chief Operating Officer of Gawker Media; and Irin Carmon, a reporter for Jezebel.com—are also citizens of New York. Nick Denton, the founder and owner of Gawker Media, is a citizen of Hungary and the United Kingdom.

## DISCUSSION

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir.

---

[11] The record does not reveal Blogwire Hungary's members. This information is necessary to determine Blogwire Hungary's citizenship. *See Fellowes, Inc. v. Changzhou Xinrui Fellowes Office Equip. Co.*, 759 F.3d 787, 790 (7th Cir. 2014) ("[Since] Changzhou Fellowes is closer to a limited liability company than to any other business structure in this nation, it does not have its own citizenship—and it *does* have the . . . citizenship of its member . . . ."). But given that Blogwire Hungary has not appeared or been served in this case, is not discussed in any of the relevant filings besides the Complaint, and is likely a dispensable party that could be dropped from the lawsuit at a later date if necessary, the missing information about its citizenship is not a barrier to the Court's current exercise of jurisdiction over this matter. *Cf. Howell by Goerdt v. Tribune Entm't Co.*, 106 F.3d 215, 217-18 (7th Cir. 1997) (dismissing a corporate defendant named in the complaint whose citizenship was unknown and who was only briefly mentioned in the case filings).

2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although a court must accept all of the plaintiff's factual allegations as true when reviewing the complaint, conclusory allegations merely restating the elements of a cause of action do not receive this presumption. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

### A. Liability for Publishing User Comments

All of Huon's claims other than his intrusion upon seclusion claim seek to hold the defendants liable for publishing "the actionable and offensive statements," a phrase Huon uses to refer collectively to the statements he challenges in the ATL Article, the Jezebel Article, and the reader comments associated with each of those articles. The defendants argue that Section 230(c)(1) of the Communications Decency Act (the "CDA"), 47 U.S.C. § 230(c)(1), bars Huon's claims against them based on reader comments.[12] Section 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* The CDA explicitly preempts liability under any inconsistent state or local laws. *Id.* § 230(e)(3). For purposes of the CDA, an

---

[12] The Gawker defendants raised this argument in their motion to dismiss. The ATL defendants did not address the question of their liability for reader comments in their motion to dismiss or reply, and Huon did not raise the issue in his response to their motion—despite being on notice of the CDA's potential applicability to this case by virtue of the Gawker motion to dismiss. Since the ATL defendants could simply file a subsequent partial motion to dismiss premised on the CDA, or a summary judgment motion with respect to that issue, and Huon has already presented his legal arguments on the statute's proper interpretation in his response to the Gawker motion to dismiss, the Court will address the import of the CDA with respect to both the ATL defendants and the Gawker defendants.

interactive computer service is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *Id.* § 230(f)(2). An information content provider is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3). In essence, the CDA says that "an online information system must not 'be treated as the publisher or speaker of any information provided by' someone else." *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008).

Huon argues that the reader comments do not constitute information provided by "someone else," and that the defendants therefore are not protected by the CDA.[13] In support of this argument, he relies on the following allegations in the Complaint: (1) that the ATL Article and the Jezebel Article were designed to incite users to post defamatory comments in order to generate advertising revenue, (2) that the defendants encouraged users to post defamatory comments in response to the articles and subsequently edited those comments, (3) that the Gawker defendants intentionally placed defamatory comments about Huon in a prominent location, which encouraged other users to post defamatory comments, and (4) that some of the allegedly defamatory comments posted in response to the Jezebel Article were written by employees of the Gawker defendants, posting under aliases. None of these allegations takes the reader comments at issue outside the protection provided by the CDA.

---

[13] Huon does not dispute that the defendants qualify as "provider[s] or user[s] of an interactive computer service."

First, a website does not incite the posting of unlawful content merely by providing a forum for that content. *See Chicago Lawyers' Comm.*, 519 F.3d at 671-72 ("Nothing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination . . . ."). This approach has been applied even where the forum is likely to or frequently does contain postings of an unlawful nature. *See, e.g.*, *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 968-69 (N.D. Ill. 2009) (citing *Chicago Lawyers' Comm.*, 519 F.3d at 671) (rejecting the plaintiff's argument that Craigslist induced users to post unlawful ads by having an "adult services" category and granting judgment on the pleadings for the defendant). Huon's argument that the defendants incited defamatory comments is further undercut by the ATL defendants' and Gawker defendants' written policies, which Huon sets forth in the Complaint, that prohibit the posting of defamatory or otherwise illegal material. *See Dart*, 665 F. Supp. 2d at 969 ("Plaintiff's argument that Craigslist causes or induces illegal content is further undercut by the fact that Craigslist repeatedly warns users not to post such content."); *see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008) ("[T]he website did absolutely nothing to encourage the posting of defamatory content—indeed, the defamatory posting was contrary to the website's express policies.").

Second, numerous courts have determined that the CDA applies even where a website edits third-party content or manipulates such content to make it more prominent. *See, e.g.*, *Dowbenko v. Google Inc.*, No. 14-10195, 2014 WL 4378742, at *3 (11th Cir. Sept. 5, 2014) (finding that the plaintiff's defamation claim was preempted by the CDA despite his allegation that Google "manipulated its search results to prominently feature the article at issue"); *Fair Hous. Council*, 521 F.3d at 1169 ("A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his [CDA]

10

immunity . . . ."); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("[L]lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish . . . or alter content—are barred [by the CDA]."). Thus, the fact that the defendants allegedly engaged in editorial functions such as determining the order of comments or making edits to them does not transform the defendants into "providers" of the comments for CDA purposes.

Finally, the allegation (on "information and belief") that some of the Jezebel Article comments were written by Gawker employees using aliases contains insufficient factual content to allow the Court to reasonably infer that the Gawker defendants were involved in creating those comments.[14] The Complaint does not allege that any of the named individual Gawker defendants posted comments to the article. Nor does it allege that the Gawker employees who allegedly posted comments did so within the scope of their employment, which is a required element of a *respondeat superior* claim in Illinois. *See Wilson v. Edward Hosp.*, 981 N.E.2d 971, 978 (2012); *cf. Marquis v. Omniguide, Inc.*, 714 F. Supp. 2d 640, 646 (N.D. Tex. 2010) (granting a motion to dismiss with respect to an allegedly defamatory statement made by an unidentified company representative, where the plaintiff failed to allege that the representative acted within the scope of his employment). As a result of these pleading deficiencies, which are not resolved by the additional allegations in Huon's response to the Gawker motion to dismiss,[15] the

---

[14] Huon makes no similar argument as to the ATL defendants.

[15] The response states: "Gawker's writers are under constant pressure to generate web traffic to keep their jobs; writers' compensation is based on the amount of web traffic the story generates. Journalist Drew Johnson has traced hundreds of 'anonymous' comments posted to promote Gawker stories to actual Gawker employees . . . ." Response to Gawker Motion to Dismiss, Dkt. 192, at 2 (footnotes omitted). The response further states: "Mr. Johnson has investigated Gawker writers creating aliases to promote their own stories and Gawker employees creating fake accounts to promote Gawker stories on Reddit.com. He concluded that the practice of creating fake accounts to post 'anonymous' comments online to promote Gawker's stories

Complaint fails to state a plausible claim that the Gawker defendants were "providers" of the comments allegedly written by Gawker employees.

Accordingly, Huon's claims are dismissed with prejudice to the extent they seek to hold the defendants liable for publishing the reader comments associated with the ATL Article and the Jezebel Article; the remaining sections of this opinion will address the defendants' liability for publishing only the content of the articles themselves.

### B.     Defamation (Counts I and II)

Huon brings defamation *per se* and *per quod* claims based on statements in the ATL Article and the Jezebel Article. "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Green v. Rogers*, 234 Ill. 2d 478, 491, 917 N.E.2d 450, 459 (2009). The elements of a defamation claim for both *per quod* and *per se* actions are "that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused

---

appear to be a companywide policy." *Id.* at 17. In support of these statements, Huon attaches a 2008 article indicating that Gawker writers receive a monthly salary plus a bonus based on the number of page views their posts receive, a July 2012 article describing recently introduced changes to Gawker's comment system, and several online posts written by Johnson in 2012. *See* Exhibits B through D to Response to Gawker Motion to Dismiss, Dkts. 195-2 through 195-7. The posts by Johnson suggest that a Gawker writer hired in February 2012 writes his Gawker articles using an alias and that, between March 2010 and November 2012, several Gawker employees or interns used aliases to create "shell" accounts on Reddit.com in order to promote Gawker articles. Read in conjunction with these supporting exhibits, none of the new factual allegations in Huon's response create a reasonable inference that Gawker employees, acting within the scope of their employment, used aliases to post comments *to the Jezebel Article*. In fact, none of the new allegations concern Gawker employees posting comments to *any* Gawker articles. Rather, the new allegations either describe developments after the publication of the Jezebel Article, suggest that some Gawker employees used aliases to post on non-Gawker websites, or "reveal" that Gawker compensates writers based on the popularity of their works, an unremarkable proposition which does nothing to push Huon's claim regarding the Gawker defendants' responsibility for some of the comments across the line "between possibility and plausibility."

damages." *Id.* at 491, 917 N.E.2d at 459. The two types of defamation claims differ only with respect to the plaintiff's burden to plead and prove damages. In a defamation *per quod* action, damage to the plaintiff's reputation is not presumed and the plaintiff must plead and prove special damages. *Tuite v. Corbitt*, 224 Ill. 2d 490, 501, 866 N.E.2d 114, 121 (2006); *see also Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 390, 882 N.E.2d 1011, 1018 (2008) ("special damages [are] actual damages of a pecuniary nature"). In a defamation *per se* action, damage is presumed if the statement falls within one of the five defamation *per se* categories recognized in Illinois:

> (1) statements imputing the commission of a crime; (2) statements imputing infection with a loathsome communicable disease; (3) statements imputing an inability to perform or want of integrity in performing employment duties; (4) statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business; and (5) statements imputing adultery or fornication.

*Tuite*, 224 Ill. 2d at 501, 866 N.E.2d at 121. Even if a statement falls within one of these categories, however, it is not actionable as defamation *per se* if it is reasonably capable of an innocent construction. *Id.* at 502, 866 N.E.2d at 121. In applying the innocent construction rule, "courts must interpret the words 'as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader.'" *Id.* at 512, 866 N.E.2d at 123 (quoting *Bryson v. News Am. Publ'ns, Inc.*, 174 Ill. 2d 77, 93, 672 N.E.2d 1207, 1217 (1996)). The preliminary determination of whether a statement is actionable as defamation *per se* is a question of law. *Id.* at 510, 866 N.E.2d at 126.

Statements that do not contain verifiable facts—such as opinions or rhetorical hyperbole—are not actionable as defamation; it is a question of law whether a statement is factual in nature. *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008). Statements that are not about the plaintiff also are not actionable as defamation. *BASF AG v. Great Am. Assurance Co.*,

522 F.3d 813, 820 (7th Cir. 2008) (citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 221 Ill. 2d 558, 579, 852 N.E.2d 825, 839 (2006)). Further, statements that are privileged cannot support a defamation claim. *Solaia Tech.*, 221 Ill. 2d at 585, 852 N.E.2d at 839. As relevant here, the fair report privilege protects publication of defamatory statements in a report of an official proceeding, provided that the report is "complete and accurate" or is "a fair abridgement" of the proceeding. *Id.* at 585, 588, 852 N.E.2d at 842, 843. Since the availability of the privilege hinges not on the reporter's status or source but on the accuracy and fairness of the report, the privilege applies regardless of whether the reporter is part of the established press and regardless of whether the reporter obtained the information directly from the official proceeding. *See, e.g.*, *Missner v. Clifford*, 393 Ill. App. 3d 751, 761, 914 N.E.2d 540, 550 (2009) ("Both media and nonmedia reporters may claim protection under the privilege."); *Bannach v. Field Enters., Inc.*, 5 Ill. App. 3d 692, 693, 284 N.E.2d 31, 32 (1972) (applying the privilege to a newspaper article that was based on a wire service report of an official proceeding).[16] It is a question of law whether the privilege applies. *Solaia Tech.*, 221 Ill. 2d at 585, 852 N.E.2d at 842.

### 1.    Defamation *Per Se* (Count I)

Huon alleges that some of the statements in the ATL Article and the Jezebel Article fall under the first, third, fourth, and fifth defamation *per se* categories, but does not specify which statements are the basis of his defamation *per se* claim. The defendants argue that each potentially actionable statement is protected by the fair report privilege, is not about Huon, does not contain verifiable facts, does not fall into one of the defamation *per se* categories, or is

---

[16] Huon's contention that the privilege does not apply to bloggers because they are not "reporters" is therefore incorrect.

14

reasonably capable of an innocent construction.[17] The Court agrees with the defendants with respect to most of the statements in the ATL Article and all of the statements in the Jezebel Article, as explained below.

### a.    The ATL Article

The allegedly defamatory portions of the ATL Article consist of: (1) five text blocks summarizing Jane Doe's testimony and defense counsel's opening statement at Huon's criminal trial,[18] (2) commentary introducing and reflecting on the trial summaries in those text blocks, (3) a section facetiously suggesting the use of sexual consent forms and proposing putatively humorous language for such a form, and (4) a section containing quotations from the Madison County Article and the Lawyer Gossip Post and suggesting that if Jane Doe had Googled Huon before agreeing to meet him, she would have found those or similar articles.[19]

---

[17] The Gawker defendants also argue that the allegedly defamatory statements in the Jezebel Article are not actionable based on the "incremental harm" doctrine. Illinois courts have not recognized that doctrine, however. *Trudeau v. ConsumerAffairs.com, Inc.*, No. 10 C 7193, 2011 WL 3898041, at *8 (N.D. Ill. Sept. 6, 2011) (citing *Myers v. The Telegraph*, 332 Ill. App. 3d 917, 925, 773 N.E.2d 192, 200 (2002)).

[18] The ATL defendants assert that these five text blocks are quotations from the BND Article. The ATL Article itself suggests that to be the case, although it is not a model of journalistic clarity in that regard. Huon, for his part, disputes the existence of the BND Article, as noted previously. This question is irrelevant, however; if the material in the text blocks is defamatory and unprivileged, liability attaches regardless of whether it is original material or a republication. *See Owens v. CBS Inc.*, 173 Ill. App. 3d 977, 992, 527 N.E.2d 1296, 1307 (1988) ("[T]he republisher of a defamatory statement made by another is himself liable for defamation . . . ."); *see also Hale v. Scott*, 371 F.3d 917, 919 (7th Cir. 2004) (citing *Owens*, 173 Ill. App. 3d at 994, 527 N.E.2d at 1308).

[19] In his response to the ATL motion to dismiss, Huon also raises a new argument that the inclusion of a hyperlink to the Lawyer Gossip Post in the ATL Article constitutes a republication of statements in the Lawyer Gossip Post that Huon claims are defamatory. This theory is not viable because the CDA, which is applicable to this case for the reasons explained in Section A, provides liability protection for both linking to and posting third-party content. *See, e.g.*, *Nieman v. Versuslaw, Inc.*, No. 12-3104, 2012 WL 3201931, at *8 (C.D. Ill. Aug. 3, 2012) (finding that the plaintiff's invasion of privacy and defamation claims, which were based on links appearing on the defendants' websites, were barred by the CDA), *aff'd*, 512 F. App'x 635 (7th Cir. 2013).

The text blocks summarizing Huon's criminal trial are protected by the fair report privilege. Although the ATL Article does not explicitly state that it is reporting on Huon's trial, it is clear both from the phrasing in the article (including references to "testimony" and defense counsel's opening statement) and from a comparison of the article with the trial transcript, Exhibit B to ATL Motion to Dismiss, Dkt. 190-2, that those portions of the article constitute a report of an "official proceeding." Huon takes issue with the fact that the article only reports on material from the first day of his trial, but the fair report privilege does not apply only to coverage of trials in their entirety. *Cf. Solaia Tech.*, 221 Ill. 2d at 589, 852 N.E.2d at 844 (finding that the privilege applies to reporting on a complaint even when there has not been any judicial action). Further, while the article does not provide a complete report of everything that happened during the first day of Huon's trial, it is a "fair abridgment" of the proceedings. *See generally id.* at 590 (noting that a report is a fair abridgment if it conveys a "substantially correct account"). The article accurately summarizes Jane Doe's testimony as well as the defense's theory of the case, as explained in the defense opening, and does not convey an erroneous impression of what was said at the trial. *See id.* The fair report privilege therefore applies.

The commentary interspersed among the text blocks summarizing the trial likewise cannot support a defamation claim. The statements suggesting that Huon was an alleged rapist, that he listed Craigslist ads claiming to be a talent scout, that he came up with a scheme to meet women, and that he lied about himself and his intentions are all protected by the fair report privilege.[20] These statements, which serve to introduce and supplement the information in the

---

[20] Most of these statements appear in the commentary about Huon that precedes the first text block summarizing the trial; that commentary reads: "We cover the rape allegations of . . . any alleged attorney rapists near you. . . . A St. Louis-area lawyer came up with an excellent little game to meet women. Meanith Huon allegedly listed Craigslist ads where he claimed to be a talent scout for models. . . . Huon's potentially harmless lies allegedly turned dastardly, pretty

text blocks, can be traced back to material in the trial transcript and do not convey an erroneous impression of what was stated.[21] Other commentary statements in the article suggesting that Huon's version of the events was "incredible," that his encounter with Jane Doe "end[ed] badly," and that Huon was "wanton," "depraved," "dastardly," and a "potential rapist" are non-actionable statements of opinion (*e.g.*, "Our next story [is] from the files of the wanton and depraved . . . . [A]pparently there are a lot of depraved dudes walking around out there that are potential rapists."). The remaining commentary statements that Huon claims are defamatory are simply not about him (*e.g.*, "I [Mystal] once pretended to be an Ostrich rancher . . . .").

The section of the article about sexual consent forms is also not actionable as defamation. That section consists of the following text:

> It seems to me that there is entirely too much (alleged) raping going on in this country. If this keeps up, men and women are going to have to start carrying around sexual consent forms on their persons.
>
> I, the undersigned, being of sound mind and hot body, do hereby consent to affixing my _____ to the other party's _____. Such amorous undulations include, but are not limited to, _____, _____, and

---

quickly." In addition, a comment after the third text block summarizing the trial questions whether "lying . . . about your job and your intentions to get [a woman] into [your] car counts as consensual."

[21] Huon challenges the ATL Article's use of the words "rape" and "rapist" given that he was charged with "criminal sexual assault" and not "rape." However, a report does not need to use the exact verbiage as the official proceeding in order to be protected by the fair report privilege. *See, e.g.*, *Harrison v. Chi. Sun-Times, Inc.*, 341 Ill. App. 3d 555, 572, 793 N.E.2d 760, 774 (2003) (finding that the fair report privilege applied where an article stated that the plaintiff had been convicted of kidnapping, even though she was actually found guilty of "wrongful removal"); *see also In re Det. of Lieberman*, 201 Ill. 2d 300, 315, 776 N.E.2d 218, 227 (2002) ("[T]he offense of rape was subsumed by the subsequently created offenses of criminal and aggravated criminal sexual assault . . . ."). Moreover, the term "rape" was used multiple times on the first day of Huon's trial, including by defense counsel in his opening argument. Thus, the fact that some of the statements in the ATL Article contain the words "rape" or "rapist" does not bring those statements outside the protection of the fair report privilege.

> ____, and all proposals will be considered so long
> as no animals (barnyard or otherwise) are involved.
>
> I claim no rights to future ____, ____, or ____, in
> exchange for this brief interruption in my chronic
> loneliness.
>
> While I may be quite intoxicated right now, I know
> damn well what I'm doing.

This section is not about Huon and does not contain any statements of fact, and therefore cannot support a defamation claim.

By contrast, the section containing the statements about Googling Huon cannot be disposed of so readily. That section appears after introductory material indicating that there were rape allegations against Huon and that Jane Doe testified that she met him after responding to a Craigslist ad he posted to recruit promotional models. The section states:

> And this, people, is why God invented Google. Had the victim
> Googled Huon, she would have found stories like this, from the
> Madison County Record:
>
>> A Chicago attorney who was posing as a supervisor
>> for a company that sets up promotions for alcohol
>> sales at area bars was charged in Madison County
>> July 2, with two counts of criminal sexual assault,
>> two counts of criminal sexual abuse and one count
>> of unlawful restraint.
>>
>> Meanith Huon, 38, of 3038 S Canal St. in Chicago,
>> was arrested by the Chicago Police Department on
>> July 1, and was transferred to Madison County the
>> next day.
>
> Or she might have come across this link, at Lawyer Gossip:
>
>> Lawyer, Meanith Huon, 39, who was originally
>> charged with criminal sexual assault, sexual abuse
>> and unlawful restraint is now facing charges of
>> harassment and cyber stalking!

Read in context, this material suggests that Huon was charged with sexual assault and related offenses, and then subsequently charged with harassment and cyberstalking, all prior to the Jane

Doe incident. It thus creates the impression that he was alleged to have committed sexual assault on two occasions—the first being the incident that prompted the sexual assault charges mentioned in the Madison County Article and Lawyer Gossip Post, and the second being the incident involving Jane Doe. The section also suggests that Huon posed as a promotions supervisor in order to meet women on an occasion prior to his interactions with Jane Doe. Since the section is erroneously presented as chronicling events unconnected to the Jane Doe incident, it is not a "substantially correct account" of an official proceeding and the statements within it are not protected by the fair report privilege. Further, since the statements convey the impression that Huon was charged with sexual assault on a prior occasion and that he posed as a promotions supervisor on a prior occasion, they qualify as defamation *per se*[22] and are not reasonably capable of an innocent construction. *Cf. Solaia Tech.*, 221 Ill. 2d at 593-94, 852 N.E.2d at 846-47 (finding that a statement implying that a civil complaint had accused the plaintiff of committing a crime was not capable of an innocent construction); *Kumaran*, 247 Ill. App. 3d at 227, 617 N.E.2d at 199 (finding that an article that impugned the plaintiff's personal integrity was not capable of an innocent construction).

---

[22] The suggestion that Huon was charged with sexual assault on a prior occasion falls within multiple defamation *per se* categories. *Cf. Solaia Tech.*, 221 Ill. 2d at 592 (finding that a statement implying that the plaintiff had been accused of committing a crime fell "within several of the recognized categories of defamation *per se*"). The suggestion that he posed as a promotions supervisor on a prior occasion falls within the fourth defamation *per se* category, since Illinois courts recognize that attacks related to personal integrity and character can "prejudice" a plaintiff in his profession if he is engaged in a profession that requires a high degree of integrity. *See Cody v. Harris*, 409 F.3d 853, 857 (7th Cir. 2005); *see also Kumaran v. Brotman*, 247 Ill. App. 3d 216, 227, 617 N.E.2d 191, 199 (1993) ("By portraying plaintiff as a swindler, the article could be found to prejudice his teaching ability and integrity because it presented him as someone who would not be an acceptable role model for young students."); *Green v. Rogers*, 384 Ill. App. 3d 946, 959, 895 N.E.2d 647, 661 (2008) (noting that statements impugning personal integrity can prejudice a lawyer in his profession), *aff'd in part and rev'd in part on other grounds*, 234 Ill. 2d 478, 917 N.E.2d 450 (2009).

Accordingly, Count I survives as to the ATL defendants only with respect to the statements in the section about Googling Huon that imply: (1) that Huon was charged with sexual assault on an occasion prior to the Jane Doe incident, and (2) that he posed as a promotions supervisor in order to meet women on an occasion prior to allegedly posting the ad to which Jane Doe responded (collectively, the "two actionable implications in the ATL Article"). Count I is dismissed with prejudice with respect to all other statements in the ATL Article.

### b. The Jezebel Article

Huon alleges that the Jezebel Article is defamatory based on: (1) the original article headline and the image placed directly below it, (2) the article's report of his criminal trial, (3) the article's report of his lawsuit based on the ATL Article, (4) a statement in the article commenting on the ATL Article and Huon's lawsuit, and (5) the hyperlink to the ATL Article placed at the bottom of the article.

The original headline of the Jezebel Article was "Acquitted Rapist Sues Blog For Calling Him Serial Rapist." The image below it contains Huon's arrest photograph superimposed over a screenshot showing the ATL Article's headline ("Rape Potpourri") and first two sentences ("We've got a couple of rape stories, but I don't have enough rape humor to fill out two posts. So we'll tackle them together."). Huon alleges that the Jezebel Article's headline and the placement of his arrest photograph near the words "rapist" and "rape" in the headline and screenshot imply that he committed rape. Although it is defamatory *per se* to falsely suggest that a person is a rapist, the challenged items are not actionable as defamation *per se* because they are reasonably capable of an innocent construction. *See generally Tuite*, 224 Ill. 2d at 502, 866 N.E.2d at 121. The headline itself expressly states that Huon was acquitted, and even if one interprets it to imply that, despite the acquittal, Huon is a rapist, it would still not be actionable as defamation *per se*

20

under the innocent construction rule. Under Illinois law, "the innocent construction rule requires a writing 'to be read as a whole.'" *Id.* at 512 (quoting *John v. Tribune Co.*, 24 Ill. 2d 437, 442, 181 N.E.2d 105, 108 (1962)). Therefore, "a headline and the text of the article to which it refers are to be considered as one document and . . . . the 'import of the entire article' must be considered in reaching a determination of reasonable innocent construction." *Harrison*, 341 Ill. App. 3d at 570, 793 N.E.2d at 772 (quoting *Owen v. Carr*, 134 Ill. App. 3d 855, 860, 478 N.E.2d 658, 662 (1985), *aff'd*, 113 Ill. 2d 273, 497 N.E.2d 1145 (1986)). However one might interpret the Jezebel Article headline and accompanying image, the associated article clearly indicates that Huon was acquitted of the charges against him. Indeed, its opening words are "A Chicago man who was acquitted on a sexual assault charge . . . ." Thus, considered in the context of the article as a whole, the headline and image are reasonably capable of an innocent construction and are not actionable as defamation *per se*. *Cf. Salamone v. Hollinger Int'l, Inc.*, 347 Ill. App. 3d 837, 840-41, 807 N.E.2d 1086, 1090-91 (2004) (finding that a headline that implied that the plaintiff was a mobster was reasonably capable of an innocent construction since the text of the article indicated that the plaintiff was only *reputed* to be a mobster); *Antonelli v. Field Enters., Inc.*, 115 Ill. App. 3d 432, 435, 450 N.E.2d 876, 878 (1983) (same); *see also Knafel v. Chi. Sun-Times, Inc.*, 413 F.3d 637, 642 (7th Cir. 2005) (citing *Salamone*, 347 Ill. App. 3d 837, 807 N.E.2d 1086, and *Antonelli*, 115 Ill. App. 3d 432, 450 N.E.2d 876).

Huon's allegations based on the report of his criminal trial in the Jezebel Article likewise cannot support a defamation claim. Huon alleges that the report is defamatory insofar as it suggests that the jury acquitted him partly on the basis of a bartender's testimony. The challenged statement appears at the end of the article's discussion of his trial and reads as follows: "Huon's version was that it was a consensual encounter, and partly on the strength of a

bartender's testimony that the woman had been drinking and asked where to go to have fun, the jury believed him." Huon asserts that the Gawker defendants never spoke to any jurors and simply invented the idea that the jury relied on the bartender's testimony in reaching its decision. That is an odd argument given that the bartender's testimony about the victim's drinking and inquiry about where to go to have fun was almost certainly evidence that *the defense* elicited at trial; Huon does not explain how a report that credits defense evidence with contributing to a verdict of acquittal could defame the successful defendant. In any event, regardless of who elicited the testimony, the statement about the jury's deliberations is not actionable for the simple reason that it is not defamatory, much less defamatory *per se*. *See Green*, 234 Ill. 2d at 491, 917 N.E.2d at 459 ("A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him."). The import of the statement is that the jury found reason to discredit Jane Doe's claims and therefore acquitted Huon of the charges; it thus bolsters rather than defames his reputation.

The challenged statements within the report of Huon's lawsuit against the ATL defendants are also not actionable as defamation. The text relating to Huon's lawsuit reads as follows:

> A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying he's a serial rapist. If Meanith Huon gets his way, blogger sloppiness may cost ATL $50 million.
> . . . .
> . . . His beef with Above The Law stems from a roundup post entitled "Rape Potpurri," in which blogger Elie Mystal mistakenly believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was a serial offender. "The content of the article were [sic] defamatory in that it incorrectly and recklessly portrayed Mr. Huon

> as a serial rapist by treating the same complaining witness as three different women," says the complaint, according to Forbes.
>
> "And this, people, is why God invented Google," wrote Mystal in the original post, linking to articles that in fact described the same case. The lesson learned: Google only takes you so far.

Huon argues that the description of his lawsuit suggests that he did not contest any aspects of the ATL Article other than the implication that he was a serial rapist. In addition, he alleges that the reference to "blogger sloppiness" minimizes the ATL Article's inaccuracies and bolsters the suggestion that he only objected to the serial rapist implication. These arguments are unavailing, however, since the Jezebel Article contains a "fair abridgment" of Huon's initial complaint and is therefore protected by the fair report privilege.[23] Although Huon later amended his complaint to add additional allegations about the ATL Article, the initial complaint was premised solely on the serial rapist implication. *See* Initial Complaint, Dkt. 1. In addition, it asserted that Mystal omitted relevant information, acted recklessly, and did not read "the original source." *Id.* at 4-5. Thus, in suggesting that Mystal was sloppy and that Huon only challenged the serial rapist implication, the Jezebel Article conveys an accurate impression of Huon's initial complaint.

The two remaining components of the Jezebel Article that Huon challenges are also inadequate to support a defamation claim. Huon alleges that the comment at the end of the report of his lawsuit ("Google only takes you so far") implies that he has a criminal background that does not show up in a Google search. But to a reasonable reader, this statement suggests that Mystal should have performed further investigation when writing the ATL Article rather than merely relying on Google; it implies that had Mystal done so, he would not have made the mistake that he did. Contrary to Huon's argument, the observation that Mystal was mistaken, and

---

[23] The Court takes judicial notice of Huon's initial complaint. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) ("We may take judicial notice of documents that are part of the public record, including pleadings, orders, and transcripts from prior proceedings in the case.").

would have caught his mistake had he not relied exclusively on Google, suggests that Huon was *not* involved in any prior similar episodes of sexual misconduct and implies nothing defamatory about him. Finally, Huon alleges that the hyperlink to the ATL Article placed at the bottom of the Jezebel Article constitutes a republishing of the allegedly defamatory content in the ATL Article. As explained above, however, the CDA provides liability protection for hyperlinking to third-party content in these circumstances. *See Nieman*, 2012 WL 3201931, at *8.

Since none of the statements or suggestions in the Jezebel Article can support a defamation *per se* claim, Count I is dismissed with prejudice with respect to the Gawker defendants.

### 2.    Defamation *Per Quod* (Count II)

Huon alleges that some of the statements in the ATL Article and the Jezebel Article, while not constituting defamation *per se*, nonetheless are defamatory and support a defamation *per quod* claim. The defendants argue that Huon has not pleaded special damages with the specificity required by Rule 9(g). As the Seventh Circuit has recently explained:

> [Rule] 9(g), says that special damages must be "specifically stated". It can be hard to know how specific is specific enough, but "specifically" must be something less than the "particularity" standard that Rule 9(b) prescribes for allegations of fraud. We need not probe the meaning of "specifically", because it is enough to identify a concrete loss.

*Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2829 (2014). In *Pippen*, the plaintiff's complaint identified "specific business opportunities that had been available to him earlier but that, following the defendants' statements, were available no more," which the Seventh Circuit found sufficiently pleaded special damages. *Id.* at 615; *see also Underground Solutions, Inc. v. Palermo*, No. 13 C 8407, 2014 WL 4703925, at *6 (N.D. Ill. Sept. 22, 2014) (citing *Pippen*, 734 F.3d at 614) (finding that special damages were sufficiently

pleaded where the complaint quoted emails from specific customers expressing concerns about using the plaintiff's products after reading the allegedly defamatory reports). In a prior case, the Seventh Circuit found that special damages were sufficiently pleaded where, "[a]lthough not naming the particular customers it lost, plaintiff listed specific figures of its gross sales before and after the publication [of the defamatory letter]." *Continental Nut Co. v. Robert L. Berner Co.*, 345 F.2d 395, 397 (7th Cir. 1965); *see also Action Repair, Inc. v. Am. Broad. Cos.*, 776 F.2d 143, 150 (7th Cir. 1985) (citing *Continental Nut*, 345 F.2d 395) (finding that the plaintiff's complaint failed to adequately plead special damages).

Here, the Complaint alleges that the allegedly defamatory statements "caused injury to Plaintiff's legal practice, business operations and good will," Complaint, Dkt. 162, ¶ 186, that Huon has "suffered damage to business, trade, profession and occupation," *id.* ¶ 197, and that he has suffered "pecuniary loss directly from a loss of clients in his legal practice and the loss of profit from business deals and interactions," *id.* ¶ 204. These allegations are nothing more than general, conclusory statements of economic loss allegedly resulting from publication of defamatory comments. In contrast to the plaintiffs in *Pippen*, *Underground Solutions*, and *Continental Nut*, Huon has not identified—or even suggested the existence of—any specific lost opportunities or clients, and has not provided any information indicating the relative success of his legal practice before and after publication of the ATL Article and Jezebel Article. Therefore, the Court finds that Huon has not pleaded special damages with sufficient specificity. *Cf. Tamburo v. Calvin*, No. 94 C 5206, 1995 WL 121539, at *9 (N.D. Ill. Mar. 17, 1995) (finding

that the plaintiff's allegations of "lost sales," "a devastating loss of business," and "loss of business reputation," were not specific enough to satisfy the requirements of Rule 9(g)).[24]

In his response to the ATL motion to dismiss, Huon requests leave to replead his defamation *per quod* claim.[25] Given that Huon has had numerous opportunities to amend his pleadings and has been on notice of the potential deficiencies in his defamation *per quod* claim since September 2011 (when the ATL defendants filed a motion to dismiss the Second Amended Complaint and raised the special damages issue), the Court finds that granting leave to replead is not warranted. *Cf. Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir. 2012) (affirming the district court's dismissal with prejudice where the plaintiffs had three opportunities to plead their claims, including an opportunity after a motion to dismiss in the case had been fully briefed). Huon has had ample opportunity to buttress his damage allegations but has not done so. Accordingly, Count II is dismissed with prejudice, and Huon can only move forward on his defamation claims with respect to statements that are actionable as defamation *per se*.[26]

---

[24] In his responses to the defendants' motions to dismiss, Huon attempts to buttress his defamation *per quod* claim by alleging that he also suffered a different type of pecuniary loss. He states that after publication of the ATL Article (which reported that he had allegedly claimed to be a talent scout) and the Jezebel Article (which linked to the ATL Article), a woman falsely accused him of posing as a talent scout, and he incurred attorney's fees in defending against the charges. This creative line of reasoning does not save Huon's defamation *per quod* claim, however, since the "talent scout" statement in the ATL Article is not actionable as defamation, as explained in Section B.1. Further, Huon has not plausibly alleged that publication of the ATL Article and Jezebel Article "caused" him to incur the attorney's fees, since he does not allege that the woman in question read the articles.

[25] Huon has not requested leave to replead any of his other claims.

[26] Even if Huon had adequately pleaded special damages, his defamation *per quod* claim would largely fail. Pursuant to the analysis in Section B.1.a, an adequately pleaded defamation *per quod* claim would survive only as to the two implications in the ATL Article that the Court finds to be actionable as defamation *per se*. And pursuant to the analysis in Section B.1.b, an adequately pleaded defamation *per quod* claim might survive as to the original headline of the Jezebel Article and the image placed directly below it, since the Court finds that material to be

### C.      False Light Invasion of Privacy (Count III)

Huon alleges that the defendants placed him in a false light by publishing the allegedly defamatory statements in the ATL Article and the Jezebel Article. Three elements are required to state a claim for the tort of false light invasion of privacy under Illinois law. First, the allegations must show that the plaintiff was "'placed in a false light before the public as a result of the defendants' actions.'" *Raveling v. HarperCollins Publishers Inc.*, No. 04-2963, 2005 WL 900232, at *3 (7th Cir. Mar. 4, 2005) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 17, 607 N.E.2d 201, 209 (1992)). Second, the court "'must determine whether a finder of fact could decide that the false light in which the plaintiff was placed would be highly offensive to a reasonable person.'" *Id.* (quoting *Lovgren v. Citizens First Nat'l Bank of Princeton*, 126 Ill. 2d 411, 419-20, 534 N.E.2d 987, 990 (1989)). Third, the plaintiff must allege "'that the defendants acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false.'" *Id.* (quoting *Kolegas*, 154 Ill. 2d at 17-18, 607 N.E.2d at 209-10). Although false light is a branch of the tort of invasion of privacy, it is closely related to the tort of defamation, and the same privileges apply to false light and defamation claims. *Sullivan v. Conway*, 157 F.3d 1092, 1098-99 (7th Cir. 1998). Thus, where a false light claim is premised on allegedly defamatory statements that a court finds are not actionable as defamation, the false light claim fails as a matter of law. *See Madison*, 539 F.3d at 659 ("[B]ecause Madison's unsuccessful defamation *per se* claim is the basis of his false-light claim, his false-light invasion of privacy claim fails as well."); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003) ("Muzikowski has not asserted special

---

not actionable as defamation *per se* in light of the innocent construction rule, a rule which does not apply to defamation *per quod* actions and which thus would not preclude a defamation *per quod* claim based on the same material. *See generally Tuite*, 224 Ill. 2d at 501-02.

damages, and so the claim can succeed only on the statements [that are defamatory *per se*].”); *cf.*
*Tuite*, 224 Ill. 2d at 515, 866 N.E.2d at 129.

The Court need only examine Huon’s false light claim with respect to the two actionable
implications in the ATL Article, since the Court has determined that the Jezebel Article and the
remainder of the ATL Article are not actionable as either defamation *per se* or *per quod*. The
Court finds that Huon has adequately stated a false light claim on the basis of the two actionable
implications in the ATL Article. Huon has adequately stated a defamation claim based on those
implications, a finder of fact could decide that the implications would be highly offensive to a
reasonable person, and the defendants have not challenged the sufficiency of Huon’s allegations
regarding actual malice. Accordingly, Count III is dismissed with prejudice as to the Gawker
defendants, survives as to the ATL defendants with respect to the two actionable implications in
the ATL Article, and is dismissed with prejudice as to the ATL defendants with respect to all
other statements in the ATL Article.

### D.      Intrusion upon Seclusion (Count IV)

Huon alleges that the defendants intentionally and unreasonably intruded into his
seclusion. The Illinois Supreme Court has joined the Illinois appellate courts in expressly
recognizing the tort of intrusion upon seclusion. *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414,
425 (2012). The elements required to state a claim for the tort are: “(1) an unauthorized intrusion
or prying into a plaintiff’s seclusion; (2) the intrusion would be ‘highly offensive or
objectionable to a reasonable person;’ (3) the matters upon which the intrusion occurred were
private; and (4) the intrusion caused anguish and suffering.” *Vega v. Chi. Park Dist.*, 958 F.
Supp. 2d 943, 959 (N.D. Ill. 2013) (quoting *Busse v. Motorola, Inc.*, 351 Ill. App. 3d 67, 71, 813
N.E.2d 1013, 1017 (2004)). “The nature of this tort depends upon some type of highly offensive

prying into the physical boundaries or affairs of another person. The basis of the tort is not publication or publicity. Rather, the core of this tort is the offensive prying into the private domain of another." *Lovgren*, 126 Ill. 2d at 416-17, 534 N.E.2d at 989; *see also Vega*, 958 F. Supp. 2d at 959 (quoting *Lovgren*, 126 Ill. 2d at 417, 534 N.E.2d at 989). "Examples of prying into private matters are opening a person's mail, searching a person's safe or wallet, and reviewing a person's banking information." *Vega*, 958 F. Supp. 2d at 959 (citing *Lawlor*, 983 N.E.2d at 424).

Huon's Complaint is devoid of any factual allegations that the defendants engaged in acts of prying or intrusion. To the contrary, the Complaint alleges that defendants invented "facts," improperly interpreted or relied on various articles that were readily available online, and failed to contact Huon or conduct investigations prior to publishing the ATL Article and the Jezebel Article. Rather than painting a picture of overzealous journalists who pried into Huon's private affairs, the Complaint depicts shoddy journalists who made up information and could not be bothered to do much more than copy and paste or summarize information from other articles easily findable on the internet. As Huon has not alleged any intrusion, which is the first element of this tort, he has failed to adequately plead his intrusion upon seclusion claim.[27] *See Vega*, 958 F. Supp. 2d at 961 ("Aside from peering into the windows of Vega's private residence, none of the other allegations are sufficient to state a plausible claim for intrusion upon seclusion. Accordingly, [the] motion to dismiss . . . is granted for all claims except the claim that the investigators peered into Vega's windows."); *Lovgren*, 126 Ill. 2d at 417, 534 N.E.2d at 989 (finding that the plaintiff had failed to adequately plead the tort of intrusion into seclusion of

---

[27] In light of this ruling, the Court finds it unnecessary to discuss the remaining elements of the tort or to reach the ATL defendants' alternate argument that the fair report privilege precludes Huon's intrusion upon seclusion claim.

another because "the alleged offensive conduct and subsequent harm resulted from the defendants' act of publication, not from an act of prying"). Count IV is therefore dismissed with prejudice as to all defendants.[28]

### E.   Intentional Infliction of Emotional Distress (Count V)

Huon alleges that the defendants' publication of the allegedly defamatory statements in the ATL Article and the Jezebel Article constituted intentional infliction of emotional distress. Under Illinois law, a plaintiff must satisfy three requirements to state a claim for intentional infliction of emotional distress. *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746-47 (7th Cir. 2008) (citing *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001)). First, "the conduct involved must be truly extreme and outrageous . . . . [It] must go beyond all bounds of decency and be considered intolerable in a civilized community." *Honaker*, 256 F.3d at 490. Second, "the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress." *Id.* Third, "the conduct must in fact cause severe emotional distress." *Id.* In evaluating whether allegedly defamatory statements constitute "extreme and outrageous" conduct, Illinois courts consider the context of the statements, including whether the defendant improperly used "'a position of power which

---

[28] To the extent that Huon's Complaint can be read as attempting to state a claim for the tort of public disclosure of private facts, it fails for a similar reason: Huon has not identified any statements in the ATL Article or the Jezebel Article that reveal private facts about him. Since "private facts" are "intimate personal facts," matters of public record—including information such as a person's name, address, and age—do not qualify. *Best v. Malec*, No. 09 C 7749, 2010 WL 2364412, at *5 (N.D. Ill. June 11, 2010) (citing *Johnson v. K mart Corp.*, 311 Ill. App. 3d 573, 578-79, 723 N.E.2d 1192, 1196 (2000) and *Geisberger v. Willuhn*, 72 Ill. App. 3d 435, 439, 390 N.E.2d 945, 948 (1979)). As explained above, the challenged portions of the articles consist of statements that are about matters of public record (*e.g.*, Huon's arrests, criminal trial, and lawsuits), statements that are allegedly false (*e.g.*, the two actionable implications in the ATL Article), statements that are not about Huon, and statements that are not factual in nature (*e.g.*, opinions); by definition, none of these items constitute private facts.

gives him the ability to adversely affect the plaintiff's interests.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Kolegas*, 154 Ill. 2d at 22, 607 N.E.2d at 212).

Since statements that do not rise to the level of defamation logically cannot rise to the even higher level of "extreme and outrageous conduct," the Court need only examine Huon's intentional infliction of emotional distress claim with respect to the two actionable implications in the ATL Article. *Cf. Flentye v. Kathrein*, 485 F. Supp. 2d 903, 922 (N.D. Ill. 2007) ("Under Illinois law, defamatory statements, if sufficiently extreme and outrageous, can support an IIED claim."); *Huon v. Beatty*, No. 1-09-2234, 2011 WL 9717454, at *1 (Ill. App. Ct. Mar. 25, 2011) ("Because the plaintiff asserts the same allegations from his [unsuccessful] defamation claims as the basis for his claims of IIED, the same allegations cannot constitute extreme and outrageous conduct.").[29] Drawing all reasonable inferences in Huon's favor, Huon has adequately alleged the elements of a claim for intentional infliction of emotional distress based on the implication that he was charged with sexual assault prior to his encounter with Jane Doe. Although the defendants argue that none of the allegedly defamatory statements constitute "extreme and outrageous conduct," Illinois courts have held that making sufficiently egregious defamatory statements can rise to that level in similar contexts.[30] *See, e.g.*, *Kolegas*, 154 Ill. 2d at 20-25, 607 N.E.2d at 211-13 (holding that radio disc jockeys' derogatory statements constituted defamation *per se* and supported a claim for intentional infliction of emotional distress); *see also Flentye*, 485 F. Supp. 2d at 922 (denying a motion to dismiss an intentional infliction of emotional distress claim premised on allegedly defamatory statements that included "assertions of a sexually repugnant nature"). Accordingly, Count V is dismissed with prejudice as to the Gawker

---

[29] This should come as no surprise to Huon, who was also the plaintiff in the *Beatty* case. The conduct on which Huon sued in *Beatty* is unrelated to the events at issue here.

[30] The ATL defendants do not challenge the adequacy of the allegations that the statements were intended to inflict, and in fact caused, severe emotional distress.

defendants, survives as to the ATL defendants with respect to the implication in the ATL Article that Huon was previously charged with sexual assault, and is dismissed with prejudice as to the ATL defendants with respect to all other statements in the ATL Article.

### F. Conspiracy (Counts VI and VII)

Huon alleges that the defendants conspired to publish the allegedly defamatory statements in the ATL Article and the Jezebel Article in order to present him in a false light (Count VII) and to defame him (Count VI). Under Illinois law, the elements of civil conspiracy are: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). Where a plaintiff successfully establishes the existence of a conspiracy, co-conspirators may be held jointly liable for actions by other members of the conspiracy. *See Geinosky*, 675 F.3d at 750. Liability for conspiracy requires an underlying tort, however; "if a 'plaintiff fails to state an independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails.'" *Jones v. City of Chi.*, No. 08 C 3501, 2011 WL 1898243, at *6 (N.D. Ill. May 18, 2011) (quoting *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 936, 803 N.E.2d 619, 626 (2004)). In addition, Illinois courts recognize the intracorporate conspiracy doctrine, which provides that "because the acts of an agent are considered to be the acts of the principal, an agent acting within the scope of his employment cannot conspire with the principal nor with other agents." *Milliman v. McHenry Cnty.*, No. 11 C 50361, 2012 WL 5200092, at *4 (N.D. Ill. Oct. 22, 2012) (citing *Buckner v. Atl. Plant Maint., Inc.*, 182 Ill. 2d 12, 24, 694 N.E.2d 565, 571 (1998)); *see also Frontline Commc'ns, Inc. v. Comcast Corp.*, No. 12-CV-8527, 2013 WL 4777370, at *3 (N.D. Ill. Sept. 5, 2013) ("Illinois

law is clear that a civil conspiracy does not exist between a corporations' own officers or employees.").

Since conspiracy is not an independent tort, the Court need only consider Huon's conspiracy claims with respect to the two actionable implications in the ATL Article, which the Court has found can support Huon's false light and defamation *per se* claims against the ATL defendants. Because the Gawker defendants are not liable for those claims, and because Huon has not alleged that there was a conspiratorial agreement between the ATL defendants and the Gawker defendants,[31] the Gawker defendants are not liable for the statements in the ATL Article under a conspiracy theory. As to the ATL defendants, since Huon's conspiracy claims based on the ATL Article are premised on an alleged agreement between the individual ATL defendants, all of whom are officers or employees of Breaking Media, the intracorporate conspiracy doctrine bars his conspiracy claims. Counts VI and VII are therefore dismissed with prejudice as to both the ATL defendants and the Gawker defendants.

### G. Tortious Interference with Prospective Economic Advantage (Count VIII)

Huon alleges that the defendants tortiously interfered with his business interests by publishing the ATL Article and the Jezebel Article. To state a claim for tortious interference with prospective economic advantage under Illinois law, a plaintiff must allege: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from

---

[31] The allegations in the Complaint provide no basis to infer a conspiratorial agreement between the ATL defendants and the Gawker defendants. Moreover, the additional allegations in Huon's responses to the motions to dismiss reveal that he has not premised his conspiracy claims on such an agreement. *See* Response to Gawker Motion to Dismiss, Dkt. 192, at 14; Response to ATL Motion to Dismiss, Dkt. 193, at 29.

the defendant's interference." *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01, 751 N.E.2d 1126, 1133-34 (2001) (quoting *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07, 667 N.E.2d 1296, 1299 (1996)) (internal quotation marks omitted). A reasonable expectancy "requires more than the hope or opportunity of a future business relationship." *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machines Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007) (citing *Anderson*, 172 Ill. 2d at 408, 667 N.E.2d at 1300), *aff'd*, 547 F.3d 882 (7th Cir. 2008); *see also Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503 (7th Cir. 1998) (quoting *Anderson*, 172 Ill. 2d at 408, 667 N.E.2d at 1299).

The Complaint states that Huon "held a reasonable expectation of entering into valid business relationships, both in his legal practice and in business," and that he had an "expectancy of entering into valid business relationships with members of the public including, but not limited to, his retention as an attorney." Complaint, Dkt. 162, ¶¶ 258, 259. The Complaint also alleges that Huon has suffered "a decline in prospective business" and "remains concerned that individuals and organizations including prospective legal clients will choose not to utilize his services." *Id.* ¶ 160, 164. These conclusory statements, which are unsupported by any facts other than the assertion that Huon is a licensed attorney, are insufficient to allege that Huon had a reasonable business expectancy. *See Del Monte Fresh Produce, N.A., Inc. v. Kinnavy*, No. 07 C 5902, 2010 WL 1172565, at *6 (N.D. Ill. Mar. 22, 2010) ("*Twombly* does require that Kinnavy set forth facts that make it plausible that she had a reasonable expectancy . . . ."). At best the statements establish, when read in the light most favorable to the plaintiff, that Huon *hoped* to obtain legal clients or enter into other business relationships.[32] As Huon has thus failed to

---

[32] That Huon was facing criminal charges until December 2011 further undermines the plausibility of his claim to have had reasonable business expectancies when the ATL Article and Jezebel Article were published.

34

adequately allege a reasonable business expectancy, *see Bus. Sys. Eng'g*, 520 F. Supp. 2d at 1022, it is unnecessary to consider whether he has satisfied any of the other elements of a tortious interference claim. *See Fredrick*, 144 F.3d at 503 (affirming dismissal of a tortious interference claim where the plaintiff "failed to allege any reasonable expectation of a business relationship" and instead alleged "merely that he wished to continue working as a commercial pilot"); *Pulliam v. Am. Express Travel Related Servs. Co.*, No. 08 C 6690, 2009 WL 1586012, at *6 (N.D. Ill. June 4, 2009) (dismissing a tortious interference claim where the plaintiff failed to allege facts sufficient to support a reasonable business expectancy); *Emery v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 02 C 9303, 2003 WL 22176077, at *10 (N.D. Ill. Sept. 18, 2003) (dismissing a tortious interference claim where the plaintiff alleged "no more than the mere hope [of obtaining] concrete opportunities"). Accordingly, Count VIII is dismissed with prejudice as to all defendants.

### H. Cyberstalking and Cyberbullying (Count IX)

Huon alleges that the defendants violated the Illinois cyberstalking statute, 720 ILCS 5/12-7.5, and asks the Court to create a private cause of action for cyberstalking. Illinois courts apply a four-factor test to determine whether to imply a private right of action from a statute:

> Implication of a private right of action is appropriate if: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute.

*Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455, 460, 722 N.E.2d 1115, 1117-18 (1999). With respect to the fourth factor, a private right of action is generally implied "only in cases where the statute would be ineffective, as a practical matter, unless a private right of action were

implied." *Abbasi ex rel. Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 395, 718 N.E.2d 181, 186 (1999). Since no Illinois court has addressed the question of whether there is an implied private right of action under the cyberstalking statute, this Court must predict how the Illinois Supreme Court would decide the issue. *See Iowa Physicians' Clinic Med. Found. v. Physicians Ins. Co. of Wisconsin*, 547 F.3d 810, 813 (7th Cir. 2008). The Court is mindful, however, of the Seventh Circuit's admonishment that federal courts sitting in diversity should be cautious in expanding state law beyond the boundaries established in that state's courts. *See King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997); *see also Markos v. Chicago Park Dist.*, No. 01 C 5544, 2002 WL 1008459, at *8 (N.D. Ill. May 13, 2002) (citing *King*, 113 F.3d at 97) (finding that an Illinois statute did not imply a private right of action).

Assuming without deciding that the first three factors of the *Fisher* test are met in this situation, the Court declines to imply a private right of action because doing so is not necessary to provide an adequate remedy for violations of the cyberstalking statute. The statute already provides a stiff penalty by categorizing cyberstalking as a Class 4 felony, *see* 720 ILCS 5/12-7.5(b), which is punishable by between one and three years of imprisonment, 730 ILCS 5/5-4.5-45; *see also People v. Sucic*, 401 Ill. App. 3d 492, 494, 928 N.E.2d 1231, 1234 (2010) (affirming defendant's conviction and three-year sentence for violating the Illinois cyberstalking statute). In addition, and as Huon's Complaint makes evident, a variety of tort remedies are potentially available to individuals who allege that they are victims of cyberstalking. Huon offers no argument that the combination of potential criminal prosecution and other civil causes of action provides inadequate remedies to victims of cyberstalking; in view of these remedies, the Court concludes that a private right of action under the statute is unnecessary and so declines to imply

one.[33] *Cf. Metzger v. DaRosa*, 209 Ill. 2d 30, 42, 805 N.E.2d 1165, 1171 (2004) ("We cannot say that the statutory framework . . . is so deficient that it is necessary to imply a private right of action . . . to effectuate its purpose."); *Lane v. Fabert*, 178 Ill. App. 3d 698, 702-03, 533 N.E.2d 546, 549 (1989) (declining to imply a private right of action where the statute at issue imposed a "substantial" fine and where the complaint demonstrated that "a wide array of remedies" was available to a plaintiff in such a situation). Accordingly, Huon cannot prevail on his cyberstalking claim and Count IX is dismissed with prejudice as to all defendants.

\* \* \*

For the reasons stated above, the Gawker defendants' motion to dismiss [174] is granted and the ATL defendants' motion to dismiss [178] is granted in part and denied in part. All of Huon's claims against the Gawker defendants are dismissed with prejudice. Huon's claims against the ATL defendants in Counts II, IV, VI, VII, VIII, and IX are dismissed in their entirety with prejudice. Huon's claims against the ATL defendants in Counts I and III survive only with respect to the two actionable implications in the ATL Article. Huon's claims against the ATL defendants in Count V survive only with respect to the implication in the ATL Article that he was charged with sexual assault prior to his encounter with Jane Doe. Huon's claims against the ATL defendants in Counts I, III, and V are dismissed with prejudice in all other respects.

Date: December 4, 2014

John J. Tharp, Jr.
United States District Judge

---

[33] In light of this ruling, the Court finds it unnecessary to reach the additional argument raised by the ATL defendants that the cyberstalking statute does not apply to the activity at issue.